NOTICE

*The text of this opinion can be corrected before the opinion is published in the* Pacific Reporter. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

YODER AUSTIN BLALOCK,

      Appellant/Cross-Appellee,

v.

STATE OF ALASKA,

      Appellee/Cross-Appellant.

Court of Appeals Nos. A-12282 & A-12301

Trial Court No. 3AN-11-12129 CR

O P I N I O N

No. 2656 — September 27, 2019

Appeal from the Superior Court, Third Judicial District, Anchorage, Jack W. Smith, Judge.

Appearances: Elizabeth D. Friedman, Law Office of Elizabeth D. Friedman, Redding, California, under contract with the Office of Public Advocacy, Anchorage, for the Appellant/Cross-Appellee. Ann B. Black, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for the Appellee/Cross-Appellant.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge HARBISON.

Following a jury trial, Yoder Austin Blalock was convicted of second-degree murder for killing Nathan Tanape. Blalock was sentenced to 60 years with 15 years suspended (45 years to serve) and was placed on probation for a period of 10 years.

Prior to trial, Blalock moved to suppress the statements he made to the police, both at the scene of his arrest and later at the police station. Blalock argued that, because he had requested an attorney at the scene, any subsequent questioning by the police in the absence of an attorney violated the United States Supreme Court's decision in *Edwards v. Arizona*.[1] Under *Edwards*, the police are precluded from initiating further interrogation of a suspect who has invoked his right to counsel, until counsel has been made available.[2]

At an evidentiary hearing, the trial court agreed with Blalock and precluded the prosecutor from introducing Blalock's statements as part of the State's case-in-chief. But the court later found that the officers' conduct was neither intentional nor egregious. Accordingly, applying Alaska Evidence Rule 412 (as interpreted by this Court in *State v. Batts*[3]), the trial court allowed the prosecutor to impeach Blalock's testimony with his statements to the police.

On appeal, Blalock challenges the trial court's ruling permitting the State to use his statements to impeach him during cross-examination. The State cross-appeals, arguing that the trial court erred in granting Blalock's motion to suppress. In particular, the State argues that Blalock was not subject to a custodial interrogation at the time he asked for a lawyer and that he was not entitled to anticipatorily invoke his *Miranda* rights. Because we conclude that the trial court did not err in allowing the impeachment use of Blalock's statements and because we otherwise affirm Blalock's conviction, we need not decide the issues raised in the State's cross-appeal.

---

[1] *See Edwards v. Arizona*, 451 U.S. 477, 484-86 (1981).

[2] *Id.* at 484-85.

[3] *See State v. Batts*, 195 P.3d 144, 151-52 (Alaska App. 2008).

At trial, Blalock defended on the ground of self-defense, and the trial court instructed the jury on this defense. Blalock asked the trial court to instruct the jury on the "Stand Your Ground" amendment — a 2013 statutory enactment that narrowed a person's duty to retreat before using deadly force in self-defense. Under this amendment, there is no duty to retreat if the person is "in any . . . place where the person has a right to be."[4] The trial court concluded that the "Stand Your Ground" law was not retroactively applicable to Blalock's case, which was based on events occurring in 2011, and the trial court declined to instruct the jury on it.

Blalock now challenges the trial court's decision. For the reasons explained here, we agree with the trial court that the statutory amendment did not apply retroactively to Blalock's case. We therefore uphold the trial court's decision declining to instruct the jury on the 2013 law.

Finally, Blalock raises several challenges to his sentence. We have reviewed his claims, and we find no merit to them.

*Factual background*

One night in October 2011, Blalock drove to Tanape's apartment where Blalock's acquaintance, Charles Alexie, and several other people were partying. Outside of the apartment, Blalock encountered Tanape. When Blalock was standing about ten feet away from Tanape, Tanape yelled at him to leave.

Blalock began walking back to his truck, saying, "Just wait right there, I got something for you." Blalock took something out of his truck and walked back toward Tanape. Blalock and Tanape faced off. Blalock sprayed Tanape with pepper spray and

---

[4] AS 11.81.335(b)(5) (enacted by SLA 2013, ch. 51, § 1).

slashed him with a knife. Tanape went to the ground; he then grabbed Blalock by the legs, picked him up, and slammed him to the ground.

Alexie ran toward Blalock and Tanape to intervene, but Blalock sprayed Alexie with pepper spray, causing Alexie to fall to the ground and have difficulty breathing. Tanape and Blalock struggled, and then Blalock got up, ran back to his truck, and drove away, leaving Tanape lying in the middle of the alley.

Alexie ran back inside the apartment, covering his eyes, and yelling for someone to call 911. Tanape came inside soon after Alexie, covered in blood and unable to speak.

Police officers responded to the apartment. When they arrived, they noticed an overwhelming smell of pepper spray and observed Tanape sitting in a chair. He had wounds on his legs and knees, a large laceration on his head, and what appeared to be a stab wound to the back of his neck.

Shortly after the officers arrived, Tanape was transported to the hospital where he was pronounced dead. The medical examiner determined that Tanape had suffered over twenty stab wounds, including one that was fatal.

After Blalock fled the scene, he called 911 several times to report that he was involved in the incident. Officers located Blalock and arrested him. They then took him to the Anchorage Police Department where detectives read him a *Miranda* warning.[5] Blalock agreed to be interviewed by the detectives, and he made incriminating statements during the interview.

---

[5] *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

Blalock was subsequently charged with second-degree murder for stabbing Tanape to death.[6] The case proceeded to trial, and Blalock was convicted of second-degree murder.

*Litigation of Blalock's motion to suppress and the use of his statements as impeachment evidence*

Prior to trial, Blalock moved to suppress the statements he made during his arrest and subsequent interview. Blalock asserted that he had clearly invoked his right to counsel during his arrest and that the on-scene police officers did not report the invocation to the detectives who later interrogated him. He contended that once he invoked his right to counsel, the Supreme Court's decision in *Edwards v. Arizona* precluded the police from initiating an interrogation with him until an attorney was present.[7] Although the detectives read him his *Miranda* rights prior to interrogating him at the station, Blalock asserted that his statements had to be suppressed because they were obtained in violation of the *Edwards* rule.

The evidence presented at the evidentiary hearing on Blalock's motion showed that when the officers first confronted Blalock, he made statements about the incident. In response, one of the officers activated his recorder.

The recording captured the conversations between Blalock and the officers as follows: Blalock initially made a variety of spontaneous statements, including repeatedly asking, "Is he okay?" At one point, an officer asked Blalock where his truck was located. Blalock responded, "Oh, it's safe. I want to talk to a lawyer." The officer replied, "What's that?" Blalock did not repeat his request for a lawyer.

---

[6] AS 11.41.110(a)(1) and/or (a)(2).

[7] *See Edwards v. Arizona*, 451 U.S. 477, 484-86 (1981).

Instead, Blalock continued making rambling statements. For example, he said, "Well . . . is (indiscernible) going to be okay or not? Fuck, when I — And when I first got away, the last time I hit him, I — something happened to his eye."

During the evidentiary hearing, the officer who made the recording testified that he did not hear Blalock state that he wanted to talk to a lawyer. The officer was aware that Blalock said something, which is why he asked Blalock to repeat himself. But the officer did not hear Blalock say anything in response.

The officer testified that during his contact with Blalock, his radio was active, so he was hearing radio traffic as well as trying to talk to Blalock. Additionally, he reported that he had significant hearing loss in certain frequencies, likely due to his experience as a firefighter and a police officer.

One of the other officers who initially contacted Blalock also testified at the hearing. He explained that, as the cover officer, he was responsible for making sure that the scene was safe until other officers arrived to help take Blalock into custody. His main concern was safety, and he was concentrating on watching Blalock's behavior to ensure there was no threat.

The detective who later interviewed Blalock testified that he did not speak with the arresting officers or listen to the recordings of their contact with Blalock before the interview.

Based on this evidence, the trial court granted Blalock's motion to suppress and excluded Blalock's statements from being used during the State's case-in-chief. The trial court found that Blalock clearly and audibly invoked his right to counsel. The trial court concluded that a reasonable officer should have heard Blalock's clear invocation because "a reasonable officer would be paying attention to statements made by the defendant, especially when he had a recording device going and was asking questions

of the defendant." The trial court therefore suppressed all statements Blalock made to the on-scene officers after he invoked his right to counsel.

The court also suppressed Blalock's later statements to the detectives at the police station. The trial court found that Blalock's waiver of his *Miranda* rights at the police station was invalid under *Edwards* because the police, not Blalock, initiated the questioning.[8]

In its written order granting Blalock's motion to suppress, the trial court ruled that Blalock's statements could not be used for any purpose during the trial "except to impeach the Defendant's contradictory testimony at trial." Blalock did not object to this ruling at that time.

The case proceeded to trial. After the State rested and the defense had begun to present its case, Blalock's attorney indicated that Blalock would testify. Blalock's attorney then asserted for the first time that the *Miranda* violation was "egregious" and "intentional" and was therefore inadmissible even for impeachment purposes under Alaska Evidence Rule 412 and this Court's decision in *State v. Batts*.[9]

After reviewing its original order and the *Batts* decision, but without hearing any additional evidence, the trial court concluded that the violation was egregious and that Blalock's statements in response to police questioning could not be used for any purpose.

The State petitioned for review, and this Court granted the State's petition. Because the *Batts* issue had not been litigated as part of the original suppression

---

[8] *See Edwards*, 451 U.S. at 484-85.

[9] *See State v. Batts*, 195 P.3d 144, 151-52, 157-58 (Alaska App. 2008) (holding that a defendant may be impeached with statements made in violation of his *Miranda* rights where "the violation consisted of a failure . . . to honor the defendant's invocation of the right to . . . counsel," unless the *Miranda* violation was either intentional or egregious).

proceedings, this Court vacated the trial court's ruling that the *Miranda* violation in Blalock's case was egregious. We held that "the State was entitled to notice and a proper opportunity to litigate the [*Batts*] issue before the [superior] court made new findings that affected the admissibility of this evidence."

Based on this ruling, the trial court conducted a second evidentiary hearing in order to address the *Batts* issue.

Some of the evidence presented at this second evidentiary hearing mirrored the evidence that had been presented to the trial court at the first evidentiary hearing. The trial court again heard that Blalock clearly announced that he wanted to talk to a lawyer. The trial court again heard officers testify that they did not hear this statement.

But the State also presented new evidence from a clinical neuropsychologist. The neuropsychologist, Paul Craig, testified about how the brain processes auditory information, and specifically how the brain suppresses some input in order to focus on relevant stimuli. Based on his review of the recording which documented Blalock's arrest, Craig concluded that what could be heard on the recording was not necessarily the equivalent of what ended up in the listeners' minds. Craig explained that other input (such as the radio traffic) would have been competing with Blalock's voice, and this impacted the ability of at least some of the officers to hear what Blalock was saying.

Craig also noted that when Blalock invoked his right to counsel, the officer closest to him had just asked him about the location of his vehicle and he was listening for an answer to that question. According to Craig, Blalock's response, asking for a lawyer, "conceptually didn't fit in" and therefore an officer might not process, hear, and comprehend that answer.

The trial court also heard from a police lieutenant who had not testified at the first hearing. The lieutenant explained that during high-risk arrests, officers are experiencing sensory overload, and their attention is consistently divided. A cover officer's primary focus is generally on the suspect's actions, specifically the hands; cover officers are watching for threatening movements or attempts to reach for weapons. Arresting officers are generally focused on the arrest itself, to make sure there is no struggle during the handcuffing process and to ensure that the suspect is secured in the patrol vehicle.

After hearing this additional evidence, the trial court issued a new ruling, this time concluding that the *Miranda* violation was neither intentional nor egregious.

The trial court found that the officers were credible when they testified that they did not hear or comprehend Blalock's request for an attorney, and it accordingly found that the officers did not act intentionally when they questioned him after he asked for an attorney.

Noting that an egregious violation is one that would be apparent to any reasonable officer, the trial court found that the violation by the officers in this case was not egregious because it was caused by natural psychological reactions and tunnel vision caused by the anxiety of a high-stress situation. The trial court also observed that this was not the type of situation where application of the exclusionary rule could have an influence on police behavior and policies.

The trial court similarly found that the detectives' interrogation of Blalock at the police station was not an egregious violation of *Miranda*. In order for the detectives to have discovered that Blalock had previously invoked his right to counsel, they would have had to listen carefully to the audio and any video recording prior to conducting the interrogation. The trial court found that requiring detectives to listen

carefully to audio and video recordings of the arrest prior to interrogating a homicide suspect is "simply too high a burden to impose on the police" and is "unreasonable."

Blalock testified, and the State introduced his statements for impeachment purposes.

*Alaska law regarding the impeachment use of statements obtained in violation of Miranda*

In *Miranda v. Arizona*, the Supreme Court held that the privilege against self-incrimination applies to questioning initiated by law enforcement officers after a person has been taken into custody and that "prior to any questioning, the person must be warned that he has a right to remain silent, that any statements he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."[10] When a suspect in custody invokes his right to counsel, the police must stop all questioning until counsel is present, unless the defendant initiates the discussion.[11]

Generally, a defendant's statements obtained in violation of *Miranda* are inadmissible except to impeach the defendant's inconsistent statements at trial.[12] In *Harris v. New York*, the Supreme Court explained this exception, concluding that a defendant's privilege to testify should not be construed to include the right to commit perjury: "The shield provided by *Miranda* cannot be perverted into a license to use

---

[10] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

[11] *Tagala v. State*, 812 P.2d 604, 609 (Alaska App. 1991) (citing *Arizona v. Roberson*, 486 U.S. 675, 677 (1988)).

[12] *See Harris v. New York*, 401 U.S. 222, 226 (1971); *Oregon v. Hass*, 420 U.S. 714, 723-24 (1975).

perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances."[13]

Alaska Evidence Rule 412 similarly allows a defendant to be impeached with certain statements obtained in violation of *Miranda*, regardless of whether the *Miranda* violation consisted of a failure to give proper warnings or a failure to honor the defendant's invocation of the right to silence or the right to counsel.[14]

In *State v. Batts*, we considered the question of whether Evidence Rule 412 is unconstitutional under the Alaska Constitution. In particular, we considered whether the Alaska exclusionary rule should be applied to prohibit even the impeachment use of statements obtained in violation of *Miranda*.[15]

We concluded that the application of Evidence Rule 412 is constitutional only when the *Miranda* violation was neither "intentional" nor "egregious."[16] We explained that a *Miranda* violation is "intentional if the officer conducting the interrogation knew that further questioning would violate *Miranda*[,] but the officer consciously chose to continue" questioning.[17] We also explained that a *Miranda* violation is "egregious if the violation would have been apparent to any reasonable police officer."[18]

---

[13]   *Harris*, 401 U.S. at 225-26.

[14]   *See State v. Batts*, 195 P.3d 144, 151-52 (Alaska App. 2008).

[15]   *Id*. at 155-58.

[16]   *Id*. at 158.

[17]   *Id*.

[18]   *Id*.

*Why we conclude that the trial court did not err when it allowed the State*
*to use Blalock's statements for impeachment purposes*

On appeal, Blalock argues that the trial court mistakenly applied a subjective standard in analyzing whether the police conduct was egregious when it should have applied an objective standard. That is, he contends that the question of whether a *Miranda* violation was egregious should not hinge on whether the officers actually heard Blalock's invocation but rather on whether a "reasonable police officer" would have heard Blalock's statement. Blalock also argues that, even if the arresting officers' violation of *Miranda* was not egregious, the detectives who interrogated Blalock at the police station subsequently committed an egregious violation of *Miranda* by not investigating whether or not he had invoked his right to counsel before they conducted their interview.

We agree that the question of whether a *Miranda* violation is "egregious" under *Batts* is an objective test. A violation is "egregious" if "the violation would have been apparent to any reasonable police officer."[19] As we said in *Batts*, "[T]he police must not be allowed to make violation of *Miranda* a tactic, nor should the government be allowed to profit from a *Miranda* violation that no reasonable police officer would have committed."[20]

Here, in analyzing whether the *Miranda* violation was egregious, the trial court correctly applied an objective test. Even though the court found, based on the testimony presented at the suppression hearing, that a reasonable officer *should* have heard Blalock's invocation of the right to counsel and therefore precluded the State from relying on Blalock's statements in its case-in-chief, the new evidence presented at the

---

[19]  *Batts*, 195 P.3d at 158.

[20]  *Id.*

*Batts* hearing led the court to conclude that the *Miranda* violation was caused by "natural neuropsychological reactions to stress, multitasking, multiple streams of communication, and focused operation by each officer." The trial court noted that Blalock's statement was a single *non sequitur* statement that did not conceptually fit in to the conversation between Blalock and the officers. It also found that a reasonable officer focused on safety concerns and distracted by radio traffic during an ongoing homicide investigation and arrest would not necessarily have heard or immediately internalized a request for counsel.

The trial court recognized the improbability that none of the arresting officers would have heard Blalock's request for counsel. But the trial court found that the officers' testimony was credible, and the court expressly concluded that "no officer heard or comprehended" the defendant's request for counsel. The trial court noted that the officer closest to Blalock clearly understood that Blalock had said *something* because he attempted to clarify Blalock's statement by asking, "What's that?" But Blalock did not repeat his request. Instead, Blalock continued talking about the crime.

After analyzing the totality of the circumstances, the trial judge found that the purpose of the exclusionary rule — *i.e.*, to deter police misconduct — would not be furthered by excluding Blalock's statements for impeachment purposes. Given the court's factual findings, which are not clearly erroneous, we conclude that the trial court did not err by finding that the arresting officers' *Miranda* violation was not egregious. We recognize that this finding is in tension with the court's earlier finding that a reasonable officer should have heard Blalock's request for counsel. But that tension serves to undermine the court's original decision to suppress Blalock's statements — not the use of Blalock's statements for impeachment purposes.

To the extent Blalock is also arguing that the trial court erred in finding that the *Miranda* violation was not "intentional," we reject this argument. We held in *Batts* that a *Miranda* violation is "intentional" if the officer consciously decides to continue questioning while knowing that such questioning violates *Miranda*.[21] This is necessarily a subjective test.

As we noted earlier, the trial court found credible the officers' testimony that they did not hear Blalock's request for counsel. This finding of credibility is entitled to broad deference.[22] The record supports the trial court's finding, and we therefore conclude that the trial court did not err in ruling that the officers did not intentionally violate *Miranda*.

Blalock also contends that, even if the arresting officers' conduct did not amount to an egregious *Miranda* violation, the conduct of the detectives who subsequently interviewed him was egregious, because the detectives did not investigate whether or not Blalock had invoked his right to counsel.

The officers in this case were interrogating Blalock shortly after he was taken into custody. The on-scene officers had not yet prepared a written report. If the detectives had asked the on-scene officers whether Blalock had requested counsel, based on their testimony the officers would honestly, but mistakenly, have responded that Blalock had not asked for a lawyer.

It is reasonable to require detectives to check with on-scene officers prior to conducting an interrogation in order to determine whether the suspect has invoked the

---

[21] *Id.*

[22] *See, e.g.*, *Rausch v. Devine*, 80 P.3d 733, 737 (Alaska 2003) ("The trial court's findings regarding the credibility of witnesses . . . may be reversed only if clearly erroneous.").

right to counsel. But Blalock's proposed rule would deem egregious a detective's failure to listen to every available audio recording before conducting a first interview with a suspect, even when, as here, the interrogation takes place during a dynamic, ongoing investigation and shortly after a suspect is brought into custody.[23] This proposed rule is inconsistent with the practical realities of police investigations.

We therefore affirm the trial court's ruling allowing the State to impeach Blalock's testimony with the statements he made to the police.

Given our ruling, and because we affirm Blalock's conviction, the State's cross-appeal challenging Blalock's motion to suppress is moot, and we do not address it further.

*Applicability of the 2013 amendment to the self-defense justification statute*

Prior to his trial, Blalock filed notice that he intended to rely on the justification of self-defense. He also asked the trial court to instruct the jury that he had no duty to retreat before using self-defense due to the recently enacted "Stand Your Ground" amendment to the self-defense statute. Under this amendment, a person who

---

[23] We note that a portion of Blalock's argument is based on the United States Supreme Court decision *Arizona v. Roberson*, 486 U.S. 675, 687-88 (1988). But *Roberson* is not directly applicable to this case. In *Roberson*, the Supreme Court held that the *Edwards* rule bars police-initiated interrogation following a suspect's request for counsel, even when the interrogation is regarding a separate investigation. *Id.* at 682-85. The Supreme Court stated that it attached no significance to the fact that the officer who conducted the second interrogation did not know that the defendant had made a request for counsel. *Id.* at 687. This is a different situation than is presented in Blalock's case, where the question is not whether Blalock's *Miranda* rights were violated, but whether the officers' conduct was intentional and egregious such that Blalock's statements could not be used even to impeach him.

is in a place where they have the right to be does not have a duty to retreat before using deadly force in self-defense.[24]

The trial court ruled that the legislative change did not apply retroactively to Blalock's case, and it declined to instruct the jury on "Stand Your Ground." Blalock now challenges this ruling.

*Legislative changes to the duty to retreat prior to the use of deadly force in self-defense*

As originally enacted in 1978, the self-defense statute provided, in pertinent part, that a person may not use deadly force in self-defense if the person knows that with complete safety, the person can avoid the necessity of using deadly force by retreating.[25] But the statute included an exception to the duty to retreat, explaining that it was not necessary to retreat when a person was in a premises that the person owned or leased.[26] Through an amendment in 2006, other exceptions were added, including that a person had no duty to retreat before using deadly force when in the person's temporary or permanent residence or in a building where the person worked in the ordinary course of employment.[27]

In 2013, the legislature added yet another exception to the self-defense statute. This exception, commonly called the "Stand Your Ground" amendment, was added by House Bill 24, and it provided that there is no duty to retreat before using

---

[24]   *See* AS 11.81.335(b)(5).

[25]   *See* SLA 1978, ch. 166, § 10; former AS 11.81.335(b) (1978).

[26]   *See* former AS 11.81.335(b)(1) & (2) (1978).

[27]   SLA 2006, ch. 68, § 3.

deadly force in self-defense if the person is "in any other place where the person has a right to be."[28]

The question raised by Blalock is whether the 2013 "Stand Your Ground" amendment applied to his 2011 killing of Nathan Tanape.

*Why we conclude that the "Stand Your Ground" amendment is not retroactive*

A statute will not be given retroactive effect unless it clearly appears that it was the legislature's intent.[29] The legislature passed the "Stand Your Ground" amendment in 2013, and it became effective on September 18, 2013, ninety days after the governor signed the bill.[30] The legislature did not set out an applicability provision as part of the legislation and therefore did not make an explicit statement that the "Stand Your Ground" amendment would apply retroactively.

Blalock argued in the trial court that the "Stand Your Ground" amendment was not a substantive change in the law but rather was simply a "clarification" of existing law, and that therefore due process required that the effective date of the "clarification" was the date of the enactment of the original statute, AS 11.81.335. As a result, he claims that the 2013 "Stand Your Ground" amendment applied to his 2011 crime.

---

[28] SLA 2013, ch. 51, § 1; *see also* AS 11.81.335(b)(5).

[29] AS 01.10.090; *see also Herscher v. State Dept. of Commerce*, 568 P.2d 996, 1001 (Alaska 1977); *State v. Kaatz*, 572 P.2d 775, 779 (Alaska 1977).

[30] SLA 2013, ch. 51, § 1; *see also* Alaska Constitution art. II, § 18 ("Laws passed by the legislature become effective ninety days after enactment."); AS 01.10.070 ("Acts become effective 90 days after becoming law, unless the legislature . . . provides for another effective date.").

Before the "Stand Your Ground" amendment was passed in 2013, a person ordinarily had a duty to retreat before using deadly force to defend themselves; there were four specifically delineated exceptions to this rule.[31] But now the law of self-defense is that there is no duty to retreat before using deadly force, as long as the person using the force is in a place where they have a right to be.[32] This is a substantive change in the law, not merely a clarification of the existing law.

The legislative history of the amendment supports our interpretation of its effect on the law of self-defense. For example, Rex Shattuck, staff member to the bill's sponsor, Representative Mark Neuman, testified during the House Judiciary Committee meeting that the "Stand Your Ground" amendment expanded locations from which there was no duty to retreat. He pointed out that the amendment eliminated the need to retreat from any location where a person has the legal right to be — such as "out camping, if you're on public land" or "outside your home."[33]

That the amendment was an expansion of the law, rather than a "clarification," also was made clear from an exchange between Representative Les Gara and Representative Neuman during the House Finance Committee meeting. During that exchange, Representative Gara expressed concern that if there was no difference between the bill and the current law, then they were "wasting" their time.[34] In response, Representative Neuman explained that, in general, existing Alaska law required persons

---

[31] Former AS 11.81.335(b) (1)-(4) (pre-Sept. 2013 version).

[32] AS 11.81.335(b)(5); *see also* SLA 2013, ch. 51, § 1.

[33] Minutes of House Judiciary Comm., House Bill 24, statement by Rex Shattuck, 1:12:18-1:12:24 p.m. (Feb. 6, 2013).

[34] Minutes of House Finance Comm., House Bill 24, statement by Representative Les Gara, 1:48:07-1:48:15 p.m. (Feb. 28, 2013).

to retreat, if they could do so safely, but that the proposed amendment changed the law by giving more weight to the right to defend oneself and others than to the duty to retreat.[35]

Blalock argues that because certain sponsors of the amendment stated that the amendment "clarifies" the law, this Court should find that the amendment was not a substantive change to the law of self-defense. For example, during the House Judiciary Committee meeting, Representative Neuman explained that House Bill 24 was necessary in light of citizens' concerns about the right to use self-defense without the courts second-guessing their decisions.[36] Representative Neuman stated that Alaska statutes already recognize a right to use force, and that House Bill 24 "clarifies that right exists not only in our home, but also in . . . any place that we have a right to be."[37] And Neuman's staffer, Rex Shattuck, reiterated that the bill was not changing justification, but rather "add[ing] clarification" to the law.[38]

Blalock's argument is unconvincing. The use of the word "clarify" by some legislators and staffers does not change the fact that the legislature's purpose in enacting the "Stand Your Ground" amendment was to expand, not clarify, the right to use deadly force in self-defense.

---

[35] *See* Minutes of House Finance Comm., House Bill 24, statement by Representative Mark Neuman, 1:52:57-1:53:39 p.m. (Feb. 28, 2013).

[36] Minutes of House Judiciary Comm., House Bill 24, statement by Representative Mark Neuman, 1:07:37-1:08:28 p.m. (Feb. 6, 2013).

[37] Minutes of House Judiciary Comm., House Bill 24, statement by Representative Mark Neuman, 1:08:40-1:08:47 p.m. (Feb. 6, 2013).

[38] Minutes of House Judiciary Comm., House Bill 24, statement by Rex Shattuck, 1:15:30-1:16:37 p.m. (Feb. 6, 2013).

We also note that other jurisdictions have concluded that similar amendments to their self-defense statutes were substantive changes to the law and that the presumption of prospective application applied in the absence of legislative intent to the contrary.[39] We agree with this conclusion.

Accordingly, because Alaska's "Stand Your Ground" amendment was not retroactively applicable to Blalock's case, the superior court did not err by refusing to instruct the jury on this portion of the self-defense statute.

*Blalock's claims regarding his sentence*

Blalock was convicted of second-degree murder, which is an unclassified felony. At the time of Blalock's offense, a person convicted of second-degree murder was subject to a sentence of not less than 10 years and not more than 99 years.[40] The court sentenced Blalock to 60 years with 15 years suspended (45 years to serve). Blalock now appeals this sentence.

At sentencing, Blalock conceded, and the court found, three aggravating factors: (1) that Blalock employed a dangerous instrument in furtherance of the offense; (2) that Blalock's criminal history included conduct involving repeated instances of assaultive behavior; and (3) that Blalock was on parole or probation for another felony charge at the time of the current crime.[41] But the court rejected Blalock's proposed mitigator — AS 12.55.155(d)(3) ("the defendant committed the offense under some

---

[39] *See, e.g.*, *Smiley v. State*, 966 So.2d 330, 334-36 (Fla. 2007); *Commonwealth v. Stone*, 291 S.W.3d 696, 703-04 (Ky. 2009); *People v. Conyer*, 762 N.W.2d 198, 200-01 (Mich. App. 2008); *Anderson v. State*, 46 So.3d 835, 838 (Miss. App. 2010).

[40] Former AS 12.55.125(b) (2011).

[41] *See* AS 12.55.155(c)(4), (8), and (20), respectively.

degree of duress, coercion, threat, or compulsion insufficient to constitute a complete defense, but that significantly affected the defendant's conduct").[42]

Blalock's first argument regarding his sentence is that the trial court erred in rejecting his proposed mitigator. But the aggravating and mitigating factors listed in AS 12.55.155(c) and (d) apply only to cases governed by presumptive sentencing.[43] Blalock was convicted of second-degree murder, a crime that is not governed by presumptive sentencing.[44] When a defendant is sentenced for second-degree murder, the judge is authorized to impose any sentence within the range of imprisonment that the legislature has established for that offense, regardless of whether aggravating or mitigating factors are proved.[45]

Although the presence or absence of statutory aggravating and mitigating factors does not control a court's sentencing authority for second-degree murder, applying the factors by analogy provides appropriate "points of reference" for determining "how a particular defendant's crime should be viewed in comparison" to similar crimes.[46]

In this case, because the aggravating and mitigating factors applied only by analogy, the judge's authority to consider this factor was not affected by whether it was proved by clear and convincing evidence (as would be required if the factors were being

---

[42] AS 12.55.155(d)(3).

[43] *Allen v. State*, 56 P.3d 683, 684 (Alaska App. 2002).

[44] *See* AS 12.55.125(b).

[45] *Allen*, 56 P.3d at 684.

[46] *Id.* at 685.

used to increase or reduce a presumptive term).  Blalock's arguments regarding the proposed mitigating factor are therefore moot.[47]

In any event, in ruling on Blalock's proposed mitigator, the trial court found that Blalock disengaged from the argument, went back to his vehicle to arm himself, and then re-engaged.  The court further found that Blalock's claim that he had been pinned to the ground when he slashed and stabbed Tanape was not credible in light of Tanape's injuries.  The trial court's characterization of the offense, and its rejection of the mitigator, were based on reasonable conclusions from the evidence.

Blalock's second contention is that his sentence is excessive because it exceeded the *Page* benchmark for first felony offenders convicted of second-degree murder.[48]  Blalock notes that the *Page* benchmark is 20-30 years and that he received 15 years of active time above that benchmark.

But the *Page* benchmark applies only to first felony offenders.[49]  Blalock had previously been convicted of felony assault, and he was on probation for that offense when he killed Tanape.  In fact, Blalock himself conceded at his sentencing that the benchmark does not apply to his case.  Accordingly, we reject this claim.

Blalock's final contention regarding his sentence is that the trial court failed to properly weigh the applicable aggravating factors and that it failed to consider Blalock's rehabilitation and mental health history.  As we have explained, the judge's sentencing authority was not affected by the judge's findings on the aggravating or

---

[47]  *See id.* at 685.

[48]  *See Page v. State*, 657 P.2d 850, 855 (Alaska App. 1983).

[49]  *Felber v. State*, 243 P.3d 1007, 1010 (Alaska App. 2010).

mitigating factors, and the aggravators applied only by analogy. But in any event, we conclude that the court adequately assessed the weight to give the aggravating factors.[50]

Determination of an appropriate sentence involves the judicial balancing of potentially competing factors, of which primacy cannot be ascribed to any particular factor.[51] The "sentencing judge has substantial discretion when evaluating the priority of the various sentencing goals and assessing the weight they should receive under the facts of a particular case."[52]

In crafting Blalock's sentence, the trial court recognized that Blalock had identified mental health issues, and it considered that factor in fashioning the appropriate sentence. But the trial court also found that isolation was important because of Blalock's "significant" criminal and assaultive history. Blalock's criminal history included numerous misdemeanor assault convictions, a conviction for felony assault, several harassment convictions, two convictions for criminal mischief, a conviction for child abuse, and a conviction for violating a protective order.

The trial court found that Blalock's criminal history demonstrated that rehabilitation was unlikely. But because Blalock had done well in confinement by

---

[50] The trial court specifically stated that it was giving aggravator (c)(4), the dangerous instrument factor, "marginal" weight. The trial court considered Blalock's probation status under aggravator (c)(20) by imposing all the remaining suspended time — almost 2 years — in the case for which Blalock was in violation of his probation. And the court discussed the importance of Blalock's prior assaultive history (aggravator (c)(8)) while evaluating the *Chaney* criteria.

[51] *Id.* (holding that a court must balance multiple objectives when sentencing a defendant, including the goals of rehabilitation, isolation, deterrence, and community condemnation).

[52] *Evan v. State*, 899 P.2d 926, 931 (Alaska App. 1995) (citing *Asitonia v. State*, 508 P.2d 1023, 1026 (Alaska 1973)).

having no documented disciplinary actions for the four years preceding sentencing, the trial court also stated that it had "some marginal hope" for Blalock's rehabilitation.

In reviewing a sentencing decision, this Court applies the "clearly mistaken" standard of review. This test is based on the premise that reasonable judges, confronted with identical facts, can and will differ on what constitutes an appropriate sentence, and, so long as that sentence is within the permissible range of reasonable sentences, it will not be modified by a reviewing court.[53]

After independently reviewing the record, we conclude that the sentence imposed is not clearly mistaken.

*Conclusion*

The judgment of the superior court is AFFIRMED.

---

[53] *Erickson v. State*, 950 P.2d 580, 586 (Alaska App. 1997).

# In the Court of Appeals of the State of Alaska

| | |
|---|---|
| **Yoder Austin Blalock,** | Court of Appeals Nos. |
| | A-12282 & A-12301 |
| Appellant/Cross-Appellee, | |
| | |
| v. | **Order** |
| | Petition for Rehearing |
| **State of Alaska,** | |
| | |
| Appellee/Cross-Appellant. | Date of Order: **12/10/2019** |

Trial Court Case No. 3AN-11-12129 CR

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

The Appellant, Yoder Austin Blalock, seeks rehearing of our decision in his case: *Blalock v. State*, ___ P.3d ___, Op. No. 2656, 2019 WL 4725166 (Alaska App. Sept. 27, 2019). Blalock raises three claims.

First, Blalock argues that the Court's opinion set out an incomplete summary of the underlying facts. As part of this claim, Blalock contends that the Court mistakenly stated, on page 4 of our slip opinion, that Nathan Tanape's death was caused by over twenty stab wounds, when (according to Blalock) the cause of death was a single stab wound to Tanape's lung.

The record supports our assertion regarding Tanape's cause of death. The medical examiner testified that Tanape's cause of death was multiple sharp force injuries, and that Tanape suffered over twenty different wounds. The medical examiner also testified, however, that the stab wound through Tanape's left lung was the "fatal injury." We are willing to amend our opinion to reflect this fact.

Second, Blalock contends that the Court mistakenly stated, on page 14 of our slip opinion, that the on-scene officers had not yet downloaded the audio on their recorders when the detectives began interviewing Blalock. Blalock suggests that this misstatement materially affected our decision to reject his proposed rule that would have required an interrogating officer, prior to undertaking an interrogation, to review every audio and video recording made by other officers in the case.

We acknowledge that we were mistaken about the timing of the officers' download. But this fact is not material to our decision. Accordingly, we will strike this statement from our opinion.

Finally, Blalock argues that we should revisit our rejection of his proposed rule requiring interrogating officers to review the prior recordings made by other officers prior to an initial interrogation. Having reviewed Blalock's petition and the State's opposition, we decline to alter our conclusion.

IT IS ORDERED:

1. The Petition for Rehearing is GRANTED IN PART.

(a) The fourth full paragraph at page 4 of our decision is amended as follows:

Shortly after the officers arrived, Tanape was transported to the hospital where he was pronounced dead. ~~An autopsy revealed that his death was caused by over twenty stab wounds.~~ <u>The medical examiner determined that Tanape had suffered over twenty stab wounds, including one that was fatal.</u> (b) The fourth paragraph at page 14 of our decision is amended by striking the words "or even downloaded the audio on their recorders":

The officers in this case were interrogating Blalock shortly after he was taken into custody. The on-scene officers had not yet prepared a written report ~~or even downloaded the audio on their recorders~~. If the detectives had asked the on-scene officers whether Blalock had requested counsel, based

on their testimony the officers would honestly, but mistakenly, have responded that Blalock had not asked for a lawyer.

2. In all other respects, the Petition for Rehearing is DENIED.

Entered by direction of the Court.

Clerk of Appellate Courts

/s/

_____

Meredith Montgomery

cc:    Court of Appeals Judges
Judge Jack W. Smith
Central Staff
Trial Court Appeals Clerk - Anchorage
Publishers

Distribution:

Elizabeth Friedman
2773 Carolee Court
Redding, CA 96002

Ann Black
Office of Criminal Appeals
1031 W. 4th Ave, Suite 200
Anchorage, AK 99501