[Cite as *State v. Gutierrez-Reynoso*, 2023-Ohio-3122.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

- vs -

DAMIAN GUTIERREZ-REYNOSO,

Defendant-Appellant.

**CASE NO. 2022-L-130**

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2022 CR 000199

**O P I N I O N**

Decided: September 5, 2023
Judgment: Affirmed

*Charles E. Coulson*, Lake County Prosecutor, and *Kristi L. Winner*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Vanessa R. Clapp*, Lake County Public Defender, and *Melissa A. Blake*, Assistant Public Defender, 125 East Erie Street, Painesville, OH 44077 (For Defendant-Appellant).

MARY JANE TRAPP, J.

{¶1} Defendant-appellant, Damian Gutierrez-Reynoso ("Mr. Gutierrez"),[1] appeals from the judgment entry of the Lake County Court of Common Pleas sentencing him to an aggregate indefinite prison term of four to six years following a jury trial. The jury found Mr. Gutierrez guilty of two counts of kidnapping, felonious assault, abduction, petty theft, and domestic violence in relation to a physical altercation with his former girlfriend.

---

1. Defendant-appellant testified at trial that he goes by the name Damian Gutierrez.

{¶2} Mr. Gutierrez raises three assignments of error, contending (1) the trial court erred in denying his Crim.R. 29(A) motion for acquittal; (2) the jury's guilty verdicts are against the manifest weight of the evidence; (3) the state failed to meet its burden of disproving his self-defense claim beyond a reasonable doubt; (4) the Reagan Tokes Law, the law pursuant to which he was sentenced, is unconstitutional; and (5) the trial court misapplied the law in imposing indefinite sentences on more than one count.

{¶3} After a careful review of the record and pertinent law, we find as follows:

{¶4} (1) The trial court did not err in denying Mr. Gutierrez's Crim.R. 29(A) motion for acquittal. The state produced sufficient evidence, if believed, to support all of his convictions.

{¶5} (2) The jury's guilty verdicts are not against the manifest weight of the evidence. Upon review, we cannot say the jury clearly lost its way and created a manifest miscarriage of justice in finding Mr. Gutierrez guilty or in concluding he did not act in self-defense.

{¶6} (3) The constitutionality of the Reagan Tokes Law is now settled. The Supreme Court of Ohio has held that the law is constitutional.

{¶7} (4) We find no plain error in the trial court's imposition of indefinite sentences for both qualifying felony offenses. The trial court's actions are consistent with the plain language of the statutory scheme.

{¶8} Thus, Mr. Gutierrez's assignments of error are without merit, and we affirm the judgment of the Lake County Court of Common Pleas.

Case No. 2022-L-130

**Substantive and Procedural History**

{¶9} This matter involves a violent altercation between Mr. Gutierrez and M.R. that occurred in Painesville, Ohio, during the early morning hours of February 20, 2022. There is no question the altercation took place, but the parties dispute the details and who was the initial aggressor.

{¶10} Mr. Gutierrez and M.R. are in their early 20s. They began dating in November 2020 and eventually moved into an apartment together in Euclid. By all accounts, their relationship was volatile. They would often get into arguments that, at times, would escalate into physical violence.

{¶11} In December 2021, Mr. Gutierrez joined M.R. and her family on a trip to Mexico. During the trip, the parties had another argument and broke up, resulting in Mr. Gutierrez leaving early.

{¶12} On New Year's Day in 2022, the parties talked about getting back together but decided not to do so. M.R. blocked Mr. Gutierrez on her phone and social media. Upon returning to the United States, M.R. moved in with her parents in Perry while Mr. Gutierrez remained at the Euclid apartment. He eventually moved into his grandmother's house in Painesville ("the Painesville house"), along with his and M.R.'s belongings.

{¶13} In early February 2022, M.R. unblocked Mr. Gutierrez on Instagram. The parties met one evening and "hooked up." On another occasion, the parties met again, at which time Mr. Gutierrez gave M.R. a cat. During this time period, the parties again decided not to get back together as a couple.

3

*The Altercation*

{¶14} On the evening of Saturday, February 19, 2022, M.R. planned to go with her friends to a "baile" in Cleveland. M.R. described a "baile" as a place with live music and dancing. She met with Mr. Gutierrez at the Painesville house, where she picked up shoes and clothing. M.R. drove her car to pick up her friends Maddie, Juan, and Lizbet in Painesville. M.R. was the group's purported designated driver.

{¶15} On the way, the group stopped at a gas station, where M.R.'s friends each bought a Twisted Tea. According to M.R., she took a few sips of Maddie's beverage and took a couple hits from Juan's "dab," which she described as a vape pen containing marijuana. Upon arrival at the baile at about 10 p.m., M.R. was given a wristband that said "21-plus" even though she was not 21 and did not present false identification.

{¶16} At about 11:30 p.m., M.R. and her group left the baile and dropped Lizbet off at her sister's house in Euclid. At about 12 a.m., they went to a dance club in the Cleveland area. M.R. quickly drank two cups containing Vodka and cranberry juice and finished half of a third cup.

{¶17} Meanwhile, Mr. Gutierrez, his cousin, and a friend drank beer at a Mentor bar from about 10:00 p.m. until they returned to the Painesville house at about 2:40 a.m. Mr. Gutierrez's grandmother was not present because she had taken a trip to Florida. The group sat in Mr. Gutierrez's room (which was the living room), drank more beer, and listened to music.

{¶18} At about 2 a.m., Mr. Gutierrez began calling and texting M.R. through Instagram. At 2:30 a.m., Mr. Gutierrez posted an inappropriate picture of M.R., which he quickly deleted. M.R.'s group subsequently left the club at about 3:15 a.m., and Mr.

4

Gutierrez continued calling M.R. He ultimately called M.R. more than 40 times. According to M.R., it was normal for Mr. Gutierrez to "blow up" her phone. M.R. largely ignored Mr. Gutierrez's calls and responded to some texts. From the calls M.R. did answer, she got the impression that Mr. Gutierrez had been drinking.

{¶19} M.R. dropped Maddie and Juan off in Painesville and continued driving. At about 4:15 a.m., M.R. texted Mr. Gutierrez and asked if she could use the restroom at the Painesville house. According to M.R., she did not want to get her friends in trouble by using their bathrooms at such a late hour.

{¶20} At about 4:30 a.m., M.R. arrived at the Painesville house. While pulling into the driveway, she lost control of her bladder and urinated in her pants. Mr. Gutierrez came to her car window and told her she could take a shower and change her clothes there. They both entered the house and went into the upstairs bathroom.

{¶21} According to M.R., she pulled her jeans down to her ankles to remove her menstrual pad and discard it in the trash. Mr. Gutierrez took out his cell phone and began recording M.R., saying "look at this whore, look at her." M.R. attempted to grab the phone out of Mr. Gutierrez's hand, at which point he began hitting her with closed fists. M.R. cowered in the corner and covered her face.

{¶22} Mr. Gutierrez left the bathroom and went downstairs, taking M.R.'s cell phone with him. M.R. ran into the hallway and hid. When Mr. Gutierrez returned, she ran downstairs, and he began chasing her. She removed her car keys from her pocket and unlocked her car with the key fob. Mr. Gutierrez grabbed her hair and removed the keys from her hand. M.R. opened the front door, ran outside with bare feet, and got into her

5

car.  She attempted to lock the car from the inside, but Mr. Gutierrez kept unlocking it with her key fob.

{¶23}  Mr. Gutierrez opened the driver's side door and tried to pull M.R. out by her hair and her arm.  M.R. held onto the steering wheel, honked the horn to get attention, and yelled for help, at which time Mr. Gutierrez bit her arm.  M.R. leaned back into the passenger's side and began honking the horn with her foot, at which time Mr. Gutierrez bit her toes.  He then grabbed her legs, got on top of her in the car, and bit her face.

{¶24}  Mr. Gutierrez exited the car from the driver's side and ran into the Painesville house.  M.R. opened the passenger door, slid out onto the driveway, and rolled into a ball.  The police arrived shortly thereafter.

{¶25}  Mr. Gutierrez would later testify to a much different version of events. According to Mr. Gutierrez, M.R. texted him at around 3 or 4 a.m. and told him to be outside.  When M.R. arrived, she told Mr. Gutierrez she had urinated herself and asked if she could shower and change her clothes.

{¶26}  According to Mr. Gutierrez, he and M.R. went to the upstairs bathroom, and she put her car keys and her phone on the vanity.  At that point, Mr. Gutierrez received a phone call from a girl named Vivianna.  M.R. tried to grab his phone to see who it was. She began attacking Mr. Gutierrez by clawing his face with her nails and punching and kicking him.  He got into a "turtle position," which he described as putting his hands over his head.  After 10 to 15 minutes of assault, M.R. went downstairs to her car, leaving her car keys and phone on the vanity.  Mr. Gutierrez followed her.

{¶27}  M.R.'s car was unlocked, and she got into the driver's seat.  Mr. Gutierrez would later testify he was concerned about M.R.'s well-being because it was cold outside,

6

she had no shoes on, and she was intoxicated. He was afraid she would cause an accident if she drove away.

{¶28} M.R. began beeping the car horn and yelling for help. Concerned about a potential noise violation, Mr. Gutierrez tried to stop her. M.R. bit down on his middle finger and would not let go. He eventually fell toward M.R. in the car and bit her chin to make her let go of his finger. When M.R. did not let go, he bit her stomach. Once M.R. finally let go of his finger, he walked back into the Painesville house, and the police arrived.

### *Investigation*

{¶29} Officer Prugel of the Painesville Police Department was dispatched to the Painesville house based on a report of people screaming. Upon arrival, he encountered M.R. sitting on the ground against her car. He observed she had blood on her face; her hair was a mess; she was wearing little clothing; and she was crying. M.R. told the officer her ex-boyfriend had assaulted her and was inside the residence. The police set up a perimeter on the house. Officer Prugel stood by the living room window, where he saw two males lying down on the couch. The officers tried to speak to the males and asked them to open the door, but they would not respond. Officer Prugel observed Mr. Gutierrez open and close a window.

{¶30} An ambulance arrived and attended to M.R.'s injuries. M.R. declined to go the hospital, stating she did not want her mother to find out what had occurred. The police took photos of M.R.'s physical injuries. Officer Prugel drove her to the police station for an interview, and M.R. called her mother. After the interview, she took M.R. to the emergency room at TriPoint hospital.

7

{¶31} Dr. Julie Pokersnik treated M.R.'s injuries, which included bite wounds on her face, toes, forearm, and abdomen; abrasions on her lip; swelling to her face; and scratch marks on her neck. M.R. denied using any alcohol or drugs the previous evening. From M.R.'s self-report, Dr. Pokersnik got the impression M.R. had sustained some of her injuries while standing up in a bathroom. The doctor asked M.R. if there was any sexual assault because it seemed "a little odd" for M.R. to have been bitten on the abdomen while standing up. M.R. denied being sexually assaulted and also denied using any alcohol or drugs the previous evening. M.R. would later experience permanent scarring from the bite wounds.

{¶32} Meanwhile, Mr. Gutierrez called his mother in Fairport Harbor and asked her to come to the Painesville house because "something happened." When she arrived, Mr. Gutierrez's shirt was removed. After observing his physical injuries, Mr. Gutierrez's mother drove him, coincidentally, to the emergency room at TriPoint hospital.

{¶33} Dr. Pokersnik also treated Mr. Gutierrez's injuries, which included scratch marks on his face and neck, abrasions on one of his fingers, and bruising and swelling on his hand. Mr. Gutierrez reported that M.R. had bitten his finger. Dr. Pokersnik would later testify she could not determine whether the abrasions were consistent with a bite. An x-ray indicated Mr. Gutierrez had fractured the bone in his hand that aligns with his ring finger, and a splint was applied. Dr. Pokersnik asked Mr. Gutierrez if he had punched anything because that was often the cause of such an injury. Mr. Gutierrez denied punching anything but did not explain what had happened to his hand.

{¶34} After leaving the hospital, Mr. Gutierrez rested at his mother's house, and his mother contacted the Fairport Harbor police so that Mr. Gutierrez could file a report.

8

The Painesville Police Department was informed of the call because they intended to arrest Mr. Gutierrez. Officer Smith from the Painesville department went with a Fairport Harbor officer to the residence. Officer Smith informed Mr. Gutierrez he would be arrested and read him his *Miranda* rights. Mr. Gutierrez reported the altercation with M.R. He was not able to elaborate on many details, stating that the parties were both intoxicated and that he did not remember. When Officer Smith asked him about the injury to his hand, Mr. Gutierrez stated he had punched the wall.

### *Criminal Proceedings*

{¶35} In June 2022, the Lake County Grand Jury indicted Mr. Gutierrez for kidnapping, a first-degree felony, in violation of R.C. 2905.01(A)(3) (count 1); kidnapping, a first-degree felony, in violation of R.C. 2905.01(B)(2) (count 2); felonious assault, a second-degree felony, in violation of R.C. 2903.11(A)(1) (count 3); abduction, a third-degree felony, in violation of R.C. 2905.02(A)(2) (count 4); two counts of petty theft, first-degree misdemeanors, in violation of R.C. 2913.02(A)(1) (counts 5 and 6); and domestic violence, a first-degree misdemeanor, in violation of R.C. 2919.25(A) (count 7).[2] Mr. Gutierrez waived his right to be present at arraignment, and the trial court entered not guilty pleas on his behalf.

{¶36} The parties exchanged discovery, and Mr. Gutierrez filed a notice of his intent to assert a claim of self-defense pursuant to Crim.R. 12.2. The matter was tried to a jury in October 2022.

---

2. The indictment also contained an eighth count for obstructing official business that was subsequently dismissed.

9

{¶37} The state presented testimony from M.R., the investigating officers, two neighbors who heard the screaming and car horn and called 911, and Dr. Pokersnik. The state presented several exhibits, including the neighbor's 911 call, photos of the Painesville house, photos of M.R.'s injuries and scars, medical records, and screenshots of M.R.'s Instagram account.

{¶38} Following the state's case-in-chief, the defense moved for acquittal pursuant to Crim.R. 29(A) on the charges of kidnapping (counts 1 and 2), abduction (count 4), and petty theft (counts 5 and 6). The trial court denied the defense's motion.

{¶39} The defense presented testimony from M.R.'s friend Juan as well as Mr. Gutierrez's cousin, grandmother, and mother. Juan testified that he and M.R. live in the same mobile home park in Perry, and M.R. picked him up and dropped him off at that location on February 19-20, 2022. On cross-examination, Juan testified he has family in Painesville and has stayed overnight there on occasion; however, he did not believe he stayed in Painesville at that time.

{¶40} During his testimony, Mr. Gutierrez recounted alleged incidents in which M.R. had scratched his face and body during physical altercations and recorded his reactions with her phone.

{¶41} The defense submitted several exhibits, including photos of the Painesville house; photos of Mr. Gutierrez's injuries; and videos M.R. had taken of Mr. Gutierrez following alleged prior assaults.

{¶42} Following deliberations, the jury found Mr. Gutierrez guilty of both counts of kidnapping (counts 1 and 2); felonious assault (count 3); abduction (count 4); petty theft of M.R.'s car keys (count 5); and domestic violence (count 7). The jury found Mr.

10

Gutierrez not guilty of petty theft of M.R.'s cell phone (count 6). The trial court ordered a presentence investigation and set the matter for sentencing.

{¶43} The trial court held a sentencing hearing in November 2022. It merged abduction (count 4) and kidnapping in violation of R.C. 2905.01(A)(3) (count 1) with kidnapping in violation of R.C. 2905.01(B)(2) (count 2). The trial court sentenced Mr. Gutierrez to indefinite prison terms of four to six years for kidnapping (count 2) and for felonious assault (count 3) and jail terms of 180 days for petty theft (count 5) and for domestic violence (count 7). It ordered the sentences to be served concurrently, resulting in an aggregate prison term of four to six years. The trial court filed a judgment entry memorializing the jury's verdicts and Mr. Gutierrez's sentences.

{¶44} Mr. Gutierrez appealed and raises the following three assignments of error:

{¶45} "[1.] The trial court erred to the prejudice of the defendant-appellant when it denied his motion for acquittal under Crim.R. 29(A).

{¶46} "[2.] The jury erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence.

{¶47} "[3.] The defendant-appellant's indeterminate prison sentence of four to six years on counts two and three that was ordered pursuant to the "Reagan Tokes Act," aka Senate Bill 201, must be reversed as the Reagan Tokes Act [is] unconstitutional."

### Sufficiency of the Evidence

{¶48} In his first assignment of error, Mr. Gutierrez contends the trial court erred in denying his motion for acquittal filed pursuant to Crim.R. 29(A).

{¶49} Crim.R. 29(A) provides "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of

11

Case No. 2022-L-130

acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses." "Thus, when an appellant makes a Crim.R. 29 motion, he or she is challenging the sufficiency of the evidence introduced by the state." *State v. Patrick*, 11th Dist. Trumbull Nos. 2003-T-0166 and 2003-T-0167, 2004-Ohio-6688, ¶ 18.

{¶50} ""Sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Id.* "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶51} While Mr. Gutierrez contends the state failed to provide sufficient evidence on all of the charges, he only sets forth argument with respect to his convictions i.e., the charges for which he was found guilty and sentenced: kidnapping (count 2), felonious assault (count 3), petty theft (count 5), and domestic violence (count 7).

{¶52} The state contends Mr. Gutierrez has waived all but plain error in relation to felonious assault and domestic violence because the defense did not move for acquittal

12

on those charges. The Supreme Court of Ohio has held that a defendant's "not guilty" plea preserves his right to object to the alleged insufficiency of the evidence. *State v. Jones*, 91 Ohio St.3d 335, 346, 744 N.E.2d 1163 (2001). Therefore, we proceed to the merits of Mr. Gutierrez's sufficiency arguments.

{¶53} Mr. Gutierrez was charged with kidnapping in violation of R.C. 2905.01(B)(2), which provides, in relevant part, "[1] No person, by force, threat, or deception, * * * [2] shall knowingly * * * [r]estrain another of the other person's liberty * * * [3] under circumstances that create a substantial risk of serious physical harm to the victim * * *." According to Mr. Gutierrez, the state did not establish he restrained M.R.'s liberty. Rather, the evidence shows M.R. initiated the visit to the Painesville house; she invited herself inside and entered voluntarily; and she was permitted to leave.

{¶54} Mr. Gutierrez's argument fails to cite the relevant testimony. The kidnapping charge in count 2 involved Mr. Gutierrez's actions when M.R. attempted to leave the Painesville house. M.R. testified that Mr. Gutierrez pulled her hair and took her keys. After she got into her car, he grabbed her arm and hair, climbed on top of her, and bit her multiple times. M.R.'s testimony, if believed, was sufficient to establish, beyond a reasonable doubt, Mr. Gutierrez committed the offense of kidnapping in violation of R.C. 2905.01(B)(2).

{¶55} Mr. Gutierrez was charged with felonious assault in violation of R.C. 2903.11(A)(1), which provides, in relevant part, "No person shall knowingly * * * [c]ause serious physical harm to another * * * [.]" He was also charged with domestic violence in violation of R.C. 2919.25(A), which provides, "No person shall knowingly cause or attempt to cause physical harm to a family or household member." According to Mr. Gutierrez,

13

the state did not establish these offenses because the evidence suggested M.R. initiated the visit and because M.R.'s version of events "did not make any sense." In particular, he notes Dr. Pokersnik's testimony that it seemed odd M.R. was bitten while she was standing upright in the bathroom.

{¶56} M.R.'s initiation of the visit has no relevance as to whether Mr. Gutierrez's actions constituted felonious assault and domestic violence. At most, it may be relevant to his self-defense claim, which is an affirmative defense. In addition, the plausibility of M.R.'s version of events relates to her credibility and the weight of her testimony, not the sufficiency of the evidence.

{¶57} Finally, Mr. Gutierrez was charged with petty theft in violation of R.C. 2913.02(A)(1), which provides, in relevant part, "[1] No person, [2] with *purpose* to *deprive* the owner of property * * *, [3] shall knowingly obtain or exert control over * * * the property * * * [4] [w]ithout the consent of the owner or person authorized to give consent[.]" (Emphasis added.)

{¶58} "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). "Deprive" means, in relevant part, "to * * * [w]ithhold property of another *permanently*, or for a period that appropriates a substantial portion of its value or use, or with purpose to restore it only upon payment of a reward or other consideration[.]" (Emphasis added.) R.C. 2913.01(C)(1).

14

{¶59} Mr. Gutierrez concedes the evidence established he took M.R.'s car keys. He contends, however, the evidence does not establish he intended to permanently deprive M.R. of this property, only that he did not want her to drive in her current condition.

{¶60} Mr. Gutierrez's argument fails to view the evidence in a light most favorable to the prosecution, as our standard of review requires. M.R. testified Mr. Gutierrez forcibly removed her car keys and retained them. The police officers testified Mr. Gutierrez would not open the door for them. M.R. further testified Mr. Gutierrez never returned her keys; rather, his mother gave them to a victim advocate during a subsequent court hearing. Based on this testimony, the jury could have reasonably believed Mr. Gutierrez intended to permanently deprive M.R. of her car keys.

{¶61} In sum, the state produced sufficient evidence to support the guilty verdicts for Mr. Gutierrez's convictions. Mr. Gutierrez's first assignment of error is without merit.

**Manifest Weight of the Evidence**

{¶62} In his second assignment of error, Mr. Gutierrez contends his convictions are against the manifest weight of the evidence.

{¶63} "[W]eight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "In other words, a reviewing court asks whose evidence is more persuasive—the state's or the defendant's?" *Id.* "'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new

15

trial ordered.'" *Thompkins, supra,* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶64} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.,* quoting *Tibbs v. Florida,* 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). "'[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * * If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978). "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 378, quoting *Martin* at 175.

{¶65} Mr. Gutierrez contends the greater weight of the evidence supports his version of events rather than M.R.'s. Mr. Gutierrez's arguments are predicated on M.R. not being a credible witness. However, "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan,* 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). This is because the trier of fact "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these

16

observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc.* at 80. "A fact finder is free to believe all, some, or none of the testimony of each witness appearing before it." *State v. Fetty*, 11th Dist. Portage No. 2011-P-0091, 2012-Ohio-6127, ¶ 58.

{¶66} Defense counsel ably attacked M.R.'s credibility through cross-examination and through conflicting testimony from her friend Juan. In addition, Mr. Gutierrez's testimony provided the jury with potential grounds upon which to reject M.R.'s allegations and accept his version of events. Despite the defense's best efforts, the jury chose to believe M.R. "[A] conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version." *State v. Ferrell*, 2020-Ohio-6879, 165 N.E.3d 743, ¶ 59 (10th Dist.).

{¶67} Upon review of the record and considering the parties' respective credibility, we cannot say the jury clearly lost its way and created a manifest miscarriage of justice in finding Mr. Gutierrez guilty. Based on unexplained gaps and inconsistencies in Mr. Gutierrez's testimony, the jury could have reasonably concluded he was not a credible witness. In addition, the purported discrepancies in M.R.'s testimony are capable of being interpreted consistently with the verdict. Accordingly, Mr. Gutierrez's convictions are not against the manifest weight of the evidence.

{¶68} The discussed portion of Mr. Gutierrez's second assignment of error is without merit.

Case No. 2022-L-130

**Self-Defense**

{¶69}  Within his second assignment of error, Mr. Gutierrez contends the state failed to meet its burden of disproving, beyond a reasonable doubt, that he acted in self-defense in relation to the offenses of felonious assault and domestic violence.

{¶70}  R.C. 2901.05(B)(1) provides, in relevant part, "A person is allowed to act in self-defense * * *.  If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense * * *, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense * * *."

{¶71}  "A self-defense claim includes the following elements: '(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.'"  *State v. Messenger*, --- Ohio St.3d ---, 2022-Ohio-4562, --- N.E.3d ---, ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002).  In cases involving the use of nondeadly force, like the present case, there is no requirement that a person retreat to avoid the danger, even if such retreat is possible.  *State v. Petway*, 2020-Ohio-3848, 156 N.E.3d 467, ¶ 43 (11th Dist.).

{¶72}  Under R.C. 2901.05(B)(1), the state has the burden of persuasion to disprove at least one of the elements of self-defense beyond a reasonable doubt.  *See*

*id.* ¶ 55. "[A] manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *Messenger* at ¶ 26.

{¶73} Mr. Gutierrez contends that the greater weight of the evidence establishes he acted in self-defense. Specifically, he contends the evidence indicates he was not at fault in creating the situation and he had reasonable grounds to believe he was in imminent danger.

{¶74} Again, Mr. Gutierrez's arguments are predicated on M.R. not being a credible witness. Despite Mr. Gutierrez's attempts to characterize the parties' violent altercation as one in which he was defending himself from M.R.'s attacks, the jury chose to believe M.R.'s testimony that Mr. Gutierrez was the initial aggressor and that she was defending herself from his attacks. Upon review of the record, we cannot say the jury clearly lost its way and created a manifest miscarriage of justice in concluding Mr. Gutierrez did not act in self-defense.

{¶75} The remainder of Mr. Gutierrez's second assignment of error is without merit.

### Constitutionality of Sentences

{¶76} In his third assignment of error, Mr. Gutierrez contends his indefinite prison sentences of four to six years ordered pursuant to the Reagan Tokes Law are invalid because the Act violates the separation of powers doctrine and the rights to a jury trial and notice.

{¶77} Mr. Gutierrez did not challenge the constitutionality of the Reagan Tokes Law in the trial court. "[T]he question of the constitutionality of a statute must generally be raised at the first opportunity and, in a criminal prosecution, this means in the trial

19

court." *Awan*, *supra*, at 122. "While an appellate court may hear a constitutional challenge that has not been raised below, such an issue is evaluated only for plain error." *State v. Shannon*, 11th Dist. Trumbull No. 2021-T-0049, 2022-Ohio-4160, ¶ 42. "When the court hears an appeal for plain error, it must presume the constitutionality of the statute at issue and will not invalidate it unless the challenger establishes that it is unconstitutional beyond a reasonable doubt." *State v. Freetage*, 11th Dist. Portage No. 2020-P-0083, 2021-Ohio-4050, ¶ 34.

{¶78} Even if we reviewed for plain error, the constitutionality of the Reagan Tokes Law is now settled. The Supreme Court of Ohio has held that the law does not violate the doctrine of separation of powers or the constitutional rights to due process or trial by jury, and, further, that it is not void for vagueness. *See State v. Hacker*, Slip Opinion No. 2023-Ohio-2535, ¶ 40-41.

{¶79} Accordingly, the discussed portion of Mr. Gutierrez's third assignment of error is without merit.

### Imposition of Sentences

{¶80} Finally, within his third assignment of error, Mr. Gutierrez contends the trial court misapplied R.C. 2929.144(B)(3) by imposing indefinite prison terms on more than one offense, i.e., for both kidnapping (count 2) and felonious assault (count 3). According to Mr. Gutierrez, the statute's plain language requires a trial court to choose the most serious qualifying offense and impose the indefinite prison term on only that offense.

{¶81} Mr. Gutierrez did not inform the trial court of this purported error. "[T]he fundamental rule is that an appellate court will not consider any error which could have been brought to the trial court's attention, and hence avoided or otherwise corrected."

20

Case No. 2022-L-130

*Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 210, 436 N.E.2d 1001 (1982). Even if we review for plain error, however, there is no obvious error in the trial court's application of the law.

**{¶82}** R.C. 2929.14(A) provides, in relevant part:

**{¶83}** "[I]f the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender pursuant to this chapter, the court *shall impose* a prison term that shall be one of the following:

**{¶84}** "(1)(a) For a felony of the first degree committed on or after March 22, 2019, the prison term *shall be* an indefinite prison term with *a stated minimum term* selected by the court of three, four, five, six, seven, eight, nine, ten, or eleven years *and a maximum term* that is *determined* pursuant to section 2929.144 of the Revised Code * * *.

**{¶85}** "* * *

**{¶86}** "(2)(a) For a felony of the second degree committed on or after March 22, 2019, the prison term *shall be* an indefinite prison term with a *stated minimum term* selected by the court of two, three, four, five, six, seven, or eight years *and a maximum term* that is *determined* pursuant to section 2929.144 of the Revised Code * * *." (Emphasis added.)

**{¶87}** R.C. 2929.144(B)(3) provides, in relevant part:

**{¶88}** "The court imposing a prison term on an offender under division (A)(1)(a) or (2)(a) of section 2929.14 of the Revised Code for a qualifying felony of the first or second degree *shall determine* the *maximum prison term* that is part of the sentence.

**{¶89}** "* * *

Case No. 2022-L-130

{¶90} "If the offender is being sentenced for more than one felony, if one or more of the felonies is a qualifying felony of the first or second degree, and if the court orders that all of the prison terms imposed are to run concurrently, the maximum term shall be equal to the longest of the minimum terms imposed on the offender under division (A)(1)(a) or (2)(a) of section 2929.14 of the Revised Code for a qualifying felony of the first or second degree for which the sentence is being imposed plus fifty per cent of the longest minimum term for the *most serious* qualifying felony being sentenced." (Emphasis added.)

{¶91} "Qualifying felony of the first or second degree" means "a felony of the first or second degree committed on or after [March 22, 2019]." R.C. 2929.144(A).

{¶92} Here, following merger, Mr. Gutierrez was sentenced for two felonies—kidnapping, a first-degree felony, and felonious assault, a second-degree felony. Both are qualifying felonies, and the trial court ordered the prison terms imposed to run concurrently. The trial court imposed minimum terms of four years for both offenses; thus, the longest minimum term for the most serious qualifying felony, i.e., kidnapping, is four years. Accordingly, the maximum term is six years (four years plus two years).

{¶93} The trial court imposed a minimum term of four years and a maximum term of six years for both qualifying felonies. Based on R.C. 2929.144(B)'s use of the singular noun "term," one may argue, as Mr. Gutierrez does, that the trial court was required to impose only a single maximum term. However, while R.C. 2929.144 governs the *calculation* of the maximum term, R.C. 2929.14(A)(1)(a) and (2)(a) govern the *imposition* of indefinite sentences. *See State v. Wilson*, 8th Dist. Cuyahoga No. 111755, 2023-Ohio-1042, ¶ 68. Both provisions state "the prison term shall be an indefinite prison term with

22

a *stated minimum term* selected by the court * * * *and a maximum term* that is determined pursuant to section 2929.144 of the Revised Code * * *." (Emphasis added.) Thus, pursuant to these provisions, the trial court is required to impose both a stated minimum term and a maximum term determined by the mathematical formula set forth in R.C. 2929.144. *See Wilson* at ¶ 69. That is exactly what the trial court did in this case; therefore, we find no plain error.

{¶94} The remainder of Mr. Gutierrez's third assignment of error is without merit.

{¶95} For the foregoing reasons, the judgment of the Lake County Court of Common Pleas is affirmed.


MATT LYNCH, J.,

ROBERT J. PATTON, J.,

concur.

Case No. 2022-L-130