[Cite as *State v. Degahson*, 2022-Ohio-2972.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2021-CA-35 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-558 |
| | : | |
| ULONDA EVETTE DEGAHSON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 26th day of August, 2022.

. . . . . . . . . .

IAN A. RICHARDSON, Atty. Reg. No. 0100124, Assistant Prosecuting Attorney, Clark County Prosecutor's Office, Appellate Division, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
        Attorney for Plaintiff-Appellee

MICHAEL R. PENTECOST, Atty. Reg. No. 0036803, 117 South Main Street, Suite 400, Dayton, Ohio 45422
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} Defendant-Appellant Ulonda Evette Degahson was found guilty of felony murder and felonious assault with attendant firearm specifications and, after merger of the offenses, she was sentenced to 18 years to life in prison for murder. She appeals from her conviction. For the reasons that follow, the judgment of the trial court will be affirmed.

## I.      Facts and Procedural History

{¶ 2} Degahson and Dewand Moore (aka "Shake") had been sexually involved for several months, but by late summer 2019, the two started having issues because, as Degahson testified, Moore became very possessive and controlling. He also purportedly became mentally and physically abusive. After weeks of the relationship's going downhill, Degahson told Moore that they were "no longer going to mess around."

{¶ 3} Despite ostensibly breaking it off with Moore, in the late-night hours of August 20, Degahson sent Moore a text message "asking if he was still up." He did not immediately respond by text, but he called Degahson close to 3 a.m. on August 21, asking "if [Degahson] was gonna open the door or if he was gonna use his key?" Degahson was troubled by the question because she had not given Moore a key.

{¶ 4} At some point after the initial phone conversation between the two, Moore arrived in front of Degahson's Bassett Drive residence in his truck. Degahson quickly put on flip flops and, wearing nothing but a night dress, she headed outside to meet him. She entered Moore's vehicle, and Moore burned her hand with a cigarette. Degahson did not exit though, and instead closed the door. She testified that things then got violent, and that Moore began slamming her head into the dashboard and choking her. According to

Degahson's testimony, she was temporarily able to escape from inside the vehicle but was quickly stopped by Moore, who then lifted her dress and tried to have sex with her.

{¶ 5} Moore's sexual advances were thwarted by a light being turned on inside the house, allowing Degahson to escape temporarily. She started to run back toward the house, but Moore was able to grab her, causing them both to tumble to the ground. They struggled in the yard, but eventually Degahson was able to free herself and flee back to the house, locking the door behind her.

{¶ 6} After an unknown amount of time, Degahson's daughter, G.L., and her friend left the house to walk to the bus stop, and as they passed Moore (who was still by his car on the street in front of the house), they told him to leave. The record is silent as to Moore's reply (if any), but Degahson admits that after seeing the interaction she walked out onto the front porch and yelled, "Don't talk to my kids!" G.L. told the jury that the two began to argue.

{¶ 7} Degahson told the jury that after she warned Moore to not talk to her kids, she went back inside the house and retrieved her gun. When she came back out, she warned Moore that he needed to leave. "I had [the gun] beside my thigh and I walked out and just told him to leave, that I wasn't gonna call the police, I wasn't gonna tell nobody that he put his hands on me, I just wanted him to leave." Trial Tr. at 566. Moore, still at the end of the driveway, stated he was not going to leave, and Degahson testified that she "just was walking towards him and just continuously to tell him to leave [sic]." Trial Tr. at 567.

{¶ 8} According to Degahson, once Moore noticed the gun, he said, "Oh, what, you

gonna shoot me? Just shoot me." Trial Tr. at 568. As she got close, Moore lunged at her, and Degahson told the jury that she closed her eyes and opened fire. She stated that she fired the gun until it ran out of bullets. When she opened her eyes, Moore was on one knee on the driveway next to a parked Buick. Degahson then found her phone, dialed 911, and waited for first responders to arrive. She did not render aid or attempt to help Moore in any way.

{¶ 9} Springfield Officer Trent Holbrook was the first person on the scene at approximately 6:30 a.m. He arrived to find Degahson standing behind the Buick in the driveway, and as he approached, Officer Holbrook noticed Moore laying face-down in the front yard. He also found cartridge casings around the driver's side and rear of Moore's truck, which was parked on the road in front of Degahson's home. The crime scene was not just limited to the immediate area around Moore's truck and Degahson's yard; a bullet was also recovered in the garage door of a adjacent neighbor, and one was discovered on the ground just beneath a bedroom window of a house across the street.

{¶ 10} Moore's wounds were fatal. His body was taken to the Montgomery County Coroner's Office, where an autopsy was performed by Dr. Russell Uptegrove. The doctor testified that he found four entrance and four exit wounds on Moore's body. According to Dr. Uptegrove, one bullet entered the chest, went through a lung, the diaphragm, liver, aorta, and left kidney, and then exited out the back. Another bullet struck one of Moore's pelvic bones, pancreas, and stomach, went through a rib, and then exited. It was also determined that Moore had been shot in the back at least once. The official cause of death: "internal hemorrhaging from multiple traumatic injuries to [the] chest and

abdomen." Trial Tr. at 300.

{¶ 11} Degahson was transported to Springfield police headquarters where she was interviewed by detectives and then indicted on counts of purposeful murder, felony murder, felonious assault, and discharge of a firearm on or near a prohibited premises. After nearly two years, the case proceeded to trial on June 1, 2021. During the four-day trial, the jury heard from a dozen witnesses, including Degahson herself, and it was given nearly 80 exhibits to consider. Degahson requested that the jury be given a self-defense instruction, specifically an instruction that she had no duty to retreat before acting in self-defense. This specific instruction was in accordance with the newly-revised R.C. 2901.09, which went into effect on April 6, 2021 – after the crime was committed but before the start of trial. After briefing from both sides, the trial court found that the statute should not be applied retroactively and denied Degahson's request. A self-defense instruction was given to the jury using the duty to retreat under former R.C. 2901.09.

{¶ 12}  After approximately three hours of deliberation, the jury found Degahson not guilty of purposeful murder but guilty of felony murder and felonious assault, each with firearm specifications. At sentencing, the court merged the felony murder and felonious assault counts, and the State elected to proceed on felony murder. The court imposed a term of 15 years to life for the felony murder conviction and an addition three-year term for the firearm specification, to be served prior to and consecutively to the underlying sentence. In all, Degahson was sentenced to 18 years to life in prison.

{¶ 13} Degahson appeals, raising two assignments of error.

**II.    The self-defense instruction was proper as given**

{¶ 14} In her first assignment of error, Degahson argues that the trial court erred when it failed to give a "stand your ground" instruction in accordance with S.B. 175.

{¶ 15} Ohio's self-defense laws have been in a state of flux over the course of the last several years. In 2019, S.B. 228 came into effect, altering R.C. 2901.05 and making self-defense no longer an affirmative defense. Instead, the burden was shifted "from the defendant to the state to prove beyond a reasonable doubt that the accused did not use force in self-defense." *State v. Brooks*, Ohio Slip Opinion No. 2022-Ohio-2478, __ N.E.3d __, ¶ 6. Then, in April 2021, S.B. 175 took effect, amending R.C. 2901.09 to indicate that "a person has no duty to retreat before using self-defense * * * if that person is in a place in which the person lawfully has a right to be." R.C. 2901.09(B). It further states that "[a] trier of fact shall not consider the possibility of retreat as a factor in determining whether or not a person who used force in self-defense * * * reasonably believed that the force was necessary to prevent injury, loss, or risk of life or safety." R.C. 2901.09(C). Simply put, the new "stand your ground" law removes, in most cases, the duty to retreat before using self-defense. While the change in the law is relatively straight forward, when it should be applied, which is the basis for this appeal, is an unsettled question.

{¶ 16} Degahson asserts that even though the shooting happened in August 2019 and the new "stand your ground" law did not go into effect until April 2021, she still should have received the updated jury instruction because the law changed before her trial. We disagree.

{¶ 17} "A statute is presumed to be prospective in its operation unless expressly made retrospective." R.C. 1.48; *Brooks* at ¶ 9. *See also Hyle v. Porter*, 117 Ohio St.3d

165, 2008-Ohio-542, 882 N.E.2d 899, ¶ 9 (a statute cannot be applied retroactively unless the legislature expressly makes it retroactive). To overcome the presumption that the statute applies prospectively, it must "clearly proclaim its retroactive application." *Id.* at ¶ 10. In this case, we find no language in the amended R.C. 2901.09 that would indicate the legislature obviously intended the statute to be applied retroactively. *Accord State v. Hurt*, 8th Dist. Cuyahoga No. 110732, 2022-Ohio-2039, ¶ 58 ("There is no language in amended R.C. 2901.09 indicating that the General Assembly intended the statute to be applied retroactively."). On this reasoning alone, the assignment of error could be overruled.

{¶ 18} Even assuming the legislature did clearly intend for the amended R.C. 2901.09 to apply retroactively, the statute would then run afoul of the Ohio Constitution, which provides that the "general assembly shall have no power to pass retroactive laws." Ohio Constitution, Article II, Section 28. "Generally, when the legislature has made a statute expressly retroactive, the determination whether the statute is unconstitutionally retroactive * * * depends on whether it is 'remedial' or 'substantive.' " *Brooks* at ¶ 10. If the law is remedial in nature, then its retroactive application is constitutional; if the law is substantive, then applying it retroactively is unconstitutional. *Id.* "Laws relating to procedures – rules of practice, courses of procedure, and methods of review – are ordinarily remedial in nature. But laws affecting rights, which may be protected by procedure, are substantive." (Citations omitted.) *Id.*

{¶ 19} We find R.C. 2901.09 to be substantive in nature. Prior to the passage S.B. 175, a person, unless in his or her residence or vehicle, had a duty to retreat before using

force in self-defense. Previous version of R.C. 2901.09(B). S.B. 175, which went into effect April 6, 2021, modified the law to read: "a person has no duty to retreat before using force in self-defense * * * if that person is in a place in which the person lawfully has a right to be." R.C. 2901.09(B). The change did more than just alter a procedure; it expanded the law, creating a new right – the right to stand one's ground. A person is no longer limited to their home or vehicle; the use of force in self-defense can now be used anywhere the person is legally permitted to be. We conclude that S.B. 175's change to R.C. 2901.09(B) is substantive in nature.

{¶ 20} While this appears to be a case of first impression for our Court, appellate courts across the country have held that changes to "stand your ground" laws are substantive in nature and thus do not allow for retroactive application. *See Blalock v. State*, 452 P.3d 675, 687 (Alaska App.2019) ("Before the 'Stand Your Ground' amendment was passed in 2013, a person ordinarily had a duty to retreat before using deadly force to defend themselves. * * * But now the law of self-defense is that there is no duty to retreat before using deadly force, as long as the person using the force is in a place where they have a right to be. This is a substantive change in the law, not merely a clarification of the existing law."); *State v. Mahler*, 157 So.3d 626, 631 (La.App.2013) (2006 amendment to "stand your ground" law changed the existing jurisprudence, was substantive in nature, and must be applied prospectively); *Smiley v. State*, 966 So.2d 330, 335-337 (Fla.2007) (amended "stand your ground" law "clearly constitutes a substantive change in the law" and is constitutionally impermissible to apply retroactively); *People v. Conyer*, 281 Mich.App. 526, 530, 762 N.W.2d 198 (2008) (statute altered the

common law of self-defense concerning duty to retreat and therefore created a substantive right; "Thus, it does not apply retroactively absent an indication that such was the intention of the Legislature in passing the statute."); *Commonwealth v. Stone*, 291 S.W.3d 696, 704 (Ky.2009) (any change to the "no duty to retreat" doctrine created by new amendment "was a change to substantive law, and therefore has no retroactive application"). We believe that the analyses of the just-mentioned cases are correct and join them today. S.B. 175's change to R.C. 2901.09 was substantive in nature and, as a result, its retroactive application would be unconstitutional.

{¶ 21} Finally, the trial court's decision not to give Degahson's requested instruction was consistent with R.C. 1.58. "If a statute is amended and becomes effective while the defendant's case is pending in the trial court, then its applicability to the defendant's case is guided by R.C. 1.58." *Hurt,* 8th Dist. Cuyahoga No. 110732, 2022-Ohio-2039, at ¶ 60, quoting *State v. Stiltner*, 4th Dist. Scioto No. 19CA3882, 2021-Ohio-959, ¶ 54. That statute provides:

(A) The reenactment, amendment, or repeal of a statute does not, except as provided in division (B) of this section:

(1) Affect any validation, cure, right, privilege, obligation, or liability previously acquired, accrued, or incurred thereunder;

(2) Affect any violation thereof or penalty, forfeiture, or punishment incurred in respect thereto, prior to the amendment or repeal;

(3) Affect any investigation, proceeding, or remedy in respect of any such privilege, obligation, liability, penalty, forfeiture, or punishment,

and the investigation, proceeding, or remedy may be instituted, continued, or enforced, and the penalty, forfeiture, or punishment imposed, as if the statute had not been repealed or amended.

(B) If the penalty, forfeiture, or punishment for any offense is reduced by a reenactment or amendment of a statute, the penalty, forfeiture, or punishment, if not already imposed, shall be imposed according to the statute as amended.

**{¶ 22}** Since the statute was amended while Degahson's case was pending, R.C. 1.58 must be applied. Accordingly, we conclude that S.B. 175 does not set out a penalty, punishment, or forfeiture, but instead provides substantive law creating a right to "stand your ground." Therefore, R.C. 1.58 dictated that the trial court apply the former version of R.C. 2901.09 to Degahson's case "because under R.C. 1.58 *substantive provisions of the former law apply to all pending prosecutions*." (Emphasis sic.) *Stiltner* at ¶ 55.

**{¶ 23}** We conclude that the trial court did not err by instructing the jury on the pre-S.B. 175 version of R.C. 2901.09, because the new version of the law became effective during the pendency of the case and the legislature did not obviously signal that it intended the amended statute to be retroactively applied. We further find that the change to R.C. 2901.09 was substantive in nature and could not be applied retroactively.

**{¶ 24}** Degahson's first assignment of error is overruled.

### III.   Manifest Weight of the Evidence

**{¶ 25}** In her second assignment of error, Degahson asserts that the judgment of the trial court was against the manifest weight of the evidence.

{¶ 26} When an appellate court reviews whether a conviction is against the manifest weight of the evidence, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A case should not be reversed as being against the manifest weight of the evidence except " 'in the exceptional case in which the evidence weighs *heavily* against the conviction.' " (Emphasis added.) *Id.*

{¶ 27} In this case, there was never any question about who shot and killed Moore; Degahson admitted it from the very beginning. The jury just had to discern whether she had a justification for doing so, and to make that determination, it had to (mostly) rely on Degahson's account(s). During her testimony at trial, Degahson told the jury that she and Moore were involved in a "situationship" (they would interact socially and have sex) and that she texted Moore sometime before midnight on August 20, 2019 "asking if he was still up." Moore did not immediately respond, but several hours later, in the early morning hours of August 21, he called her back and showed up at her Bassett Street residence.

{¶ 28} Seeing that Moore was parked in front of her house, Degahson went out to meet him wearing nothing but a night shirt and sandals. Degahson entered Moore's truck and, according to her testimony, a lengthy physical altercation ensued, both in and around Moore's truck and in the front yard. Eventually, she was able to escape back into her

house and lock the door behind her.

{¶ 29} At some point between 6:00 and 6:30 a.m., Degahson's daughter and a family friend left the house to walk to the bus stop, and as they passed Moore (who was still with his truck on the street in front of the house), they exchanged words. Degahson, who was by now on her front porch, testified that she told Moore "Don't talk to my kids," and then went back inside and retrieved a gun.

{¶ 30} Testimony indicated that Degahson proceeded to walk, gun at hip, toward Moore, demanding that he leave. As she got close, Moore, who had by then noticed the gun, stated "Oh, what, you gonna shoot me?" Degahson told the jury that Moore lunged at her and then she began shooting with her eyes closed. She fired until the gun did not shoot anymore, and when she opened her eyes, Moore was on one knee on the driveway next to a parked Buick. Degahson then called 911 and waited outside for first responders to arrive.

{¶ 31} In addition to Degahson's trial testimony, the jury was played a video interview she did with Springfield detectives a few hours after the shooting. Degahson's words in the interview painted a different picture of the lead-up to Moore's death.

{¶ 32} Degahson told detectives that she texted Moore "U up?" and then hours later, approximately 5 a.m., he showed up to her house. She confirmed that Moore made threats, specifically to break her jaw, but Degahson was clear that she was not intimidated by him. "I'm thinking the whole time: he ain't gonna hit me – He ain't gonna do nothin' to actually harm me." Interview video at 1:26.54. The interview also showed that both parties were physically aggressive. Degahson described that at one point she pushed Moore to

the ground and positioned herself on top of him in the yard. The video also indicated that Degahson did not have to escape into the house: "I wasn't running from him, I was literally just going into my house to tell my daughter, 'Hey, it's time for you to go to the bus.'" Interview video at 1:23.00.

{¶ 33} Once inside, she collected the gun from under her bed and then went back out with the gun at her hip. Degahson told detectives that she and Moore walked from the house down the driveway with Moore "grabbin' and kissin' on me." She made it clear they were not going to have sex and then ran toward Moore's truck with him following. Degahson then threatened Moore with the gun. She described that Moore put his hands up in what could be described as a "defensive position" and taunted, "Come on. Here I am. Shoot me." Interview video at 1:31.30. She told detectives that "he lunged for me to hit me, and I shot him." Interview video at 1:31.37. Degahson described that Moore went around the car and she kept shooting. "My hand was on the trigger, and I kept shooting him." Interview video at 1:32.05. Degahson fired the weapon until it ran out of bullets and explained that Moore made his way into the grass in front of her house, told her that he loved her, and said, "I can't believe you fuckin' shot me." Interview video at 1:32.45. She then took the gun back inside and called 911, but there is no indication that Degahson attempted to render aid to Moore.

{¶ 34} The jury also heard testimony from G.L., Degahson's teenage daughter, who testified that when her mother came back inside the house she made the comment, "I'm gonna have to shoot him." Trial Tr. at 245. Detective Sandy Fent testified that despite the claims of abuse at the hands of Moore, she observed no bruises, scratches, scrapes,

or swelling on Degahson's person that pointed to a physical altercation.

{¶ 35} The jury had two versions of the events before it: the story that Degahson told during her direct examination almost two years after the shooting and the story she told detectives just hours after the shooting. In the end, the jury believed that Degahson had not acted in self-defense and was guilty of murder. We cannot say that that determination demonstrated that the jury lost its way. "The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61 and 2013-CA-62, 2014-Ohio-3432, ¶ 24. Consequently, even though this Court acts as a thirteenth juror when considering whether the manifest weight of the evidence requires reversal, we must give great deference to the jury's determination of the witnesses' credibility. *State v. Williams*, 10th Dist. Franklin No. 02AP-35, 2002-Ohio-4503, ¶ 58. The jury in this case did not believe that Degahson had acted in self-defense, and that determination did not create a miscarriage of justice.

{¶ 36} Degahson's conviction was not against the manifest weight of the evidence. Her second assignment of error is overruled.

## IV.    Conclusion

{¶ 37} The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

WELBAUM, J. and LEWIS, J., concur.


Copies sent to:

Ian A. Richardson
Michael R. Pentecost
Hon. Richard J. O'Neill