[Cite as *State v. Barker*, 2025-Ohio-56.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29945 |
| | : | |
| v. | : | Trial Court Case No. 2019 CR 01747 |
| | : | |
| CARSON BARKER | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on January 10, 2025

. . . . . . . . . . .

JOHNNA M. SHIA, Attorney for Appellant

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} In September 2023, a Montgomery County jury found Defendant-Appellant Carson Baker guilty of murder and discharge of a firearm on or near prohibited premises, each of which included a firearm specification. The trial court imposed an aggregate prison sentence of a minimum term of 29 years to life and a maximum term of 33 years

to life and ordered Barker to pay court costs and restitution. The trial court gave Barker 749 days of jail-time credit.

{¶ 2} Barker appeals from his convictions. He claims that the jury's rejection of his self-defense claim was against the manifest weight of the evidence, that the trial court erred by not giving the jury an instruction based on Ohio's recently enacted "stand your ground" law, that the trial court erred in its calculation of jail-time credit, that the trial court erred by not considering Barker's present and future ability to pay before ordering him to pay court costs and restitution, and that the trial court's imposition of consecutive sentences was clearly and convincingly unsupported by the record. For the following reasons, the trial court's judgment will be affirmed in part and reversed in part, and the cause will be remanded to the trial court for the limited purpose of resentencing Barker.

I.     Facts and Course of Proceedings

{¶ 3} This appeal involves Barker's second jury trial relating to the May 26, 2019 fatal shooting of Christopher Campbell. Three months after the shooting, Barker was charged in a nine-count indictment with two counts of murder, two counts of felonious assault, one count of discharge of a firearm on or near prohibited premises, two counts of having weapons while under disability, and two counts of tampering with evidence (clothing and gun). Five of the charges included a firearm specification. *State v. Barker*, 2022-Ohio-3756, ¶ 10 (2d Dist.) ("*Barker I*").

{¶ 4} Prior to his first trial, Barker requested a jury instruction on self-defense consistent with the changes to R.C. 2901.09 enacted in Am.S.B. 175 (the "stand your

ground" law), effective April 6, 2021. The trial court denied the request, reasoning that there was no language in R.C. 2901.09 that expressly indicated that the General Assembly intended the statute to apply retroactively. *Barker I* at ¶ 11, citing Decision (June 7, 2021).

{¶ 5} The State asked the trial court for three specific jury instructions: (1) consciousness of guilt, (2) a definition of "fault" consistent with *State v. Wallace-Lee*, 2020-Ohio-3681 (2d Dist.), for purposes of self-defense, and (3) the castle doctrine with respect to the victim's duty to retreat. Defense counsel opposed the State's requested instructions on fault and the castle doctrine. *Barker I* at ¶ 12.

{¶ 6} In June 2021, the matter proceeded to a bench trial on the two counts of having weapons while under disability and to a jury trial on the remaining charges and specifications. At the jury trial, the State presented 14 witnesses and numerous exhibits; Barker testified in his own defense. After the presentation of evidence, the trial court provided jury instructions, which included the instructions requested by the State. The jury found Barker not guilty of both counts of tampering with evidence but guilty of the remaining charges and specifications before it. The trial court found him guilty of having weapons while under disability. *Id.* at ¶ 13.

{¶ 7} At sentencing, pursuant to the Reagan Tokes Act, the trial court imposed an indefinite prison sentence of a minimum of 8 years and a maximum of 12 years for discharge of a firearm on or near prohibited premises (Count 5), plus an additional three years for the accompanying firearm specification. After merging the felonious assault and murder counts, the trial court imposed 15 years to life in prison for murder (Count 2),

plus an additional three years for the firearm specification, to be served prior to the sentence on Count 5. The court merged the two counts of having weapons while under disability and ordered Barker to serve three years in prison on Count 9, to be served concurrently to Count 5. The court ordered Barker to pay $4,608.78 in restitution to the victim's family, but it waived costs and fees. Barker filed a timely notice of appeal. *Id.* at ¶ 14-15.

{¶ 8} In our October 21, 2022 decision, we affirmed the trial court's judgment with respect to Barker's conviction for having weapons while under disability. *Id.* at ¶ 65. However, we reversed Barker's convictions for murder and discharge of a firearm on or near prohibited premises, including those firearm specifications. *Id.* We held that the trial court's jury instruction on self-defense had been unreasonably broad relating to the provided definition of "fault." We concluded:

> The primary question for the jury was who drew their weapon first. Under the given instruction, the jury could have concluded that Campbell drew his weapon first, but Barker nevertheless was at fault simply because he failed to leave the area once he noticed Campbell's vehicle. Such a conclusion is not supported by our case law. Accordingly, the trial court abused its discretion in instructing the jury, as stated in the second paragraph defining "fault," that Barker would be at fault merely by continuing to go to a place where Campbell was or refusing to move in a direction away from Campbell.

*Id.* at ¶ 53.

{¶ 9} Barker was re-tried on September 5-7, 2023. Twelve witnesses testified for the State, and several exhibits were admitted into evidence. Barker's recorded video testimony from the first trial was also presented to the jury, with a few redactions. Barker chose to not testify at the second trial.

{¶ 10} The evidence presented at the second trial primarily involved the events involving Barker and Campbell that occurred on May 26, 2019, and the investigation that ensued after Barker shot and killed Campbell. Shortly before 6:00 p.m. on May 26, 2019, Barker walked from a bus stop toward his mother's home, which was located on West Second Street just west of the intersection with North Antioch Street. As he came down the sidewalk on North Antioch Street, Barker saw Campbell seated in his red Chevy Tahoe, which was parked on West Second Street near the residence of Barker's mother. Campbell's fiancée testified that Campbell had gone there to visit Moses Goodman, Campbell's friend and Barker's step-father.

{¶ 11} According to Barker's version of events, Campbell had been following and menacing Barker for a couple of months, which caused Barker to be fearful that Campbell would harm him. Campbell had told Barker that he was upset that Barker's uncle had "told on him" for selling drugs. Barker stated that Campbell was a drug dealer, and Barker knew that Campbell had killed before. According to Barker, about a month before the shooting, Barker approached Campbell at a gas station and confronted him about Campbell and his associates following Barker. Campbell denied following Barker and "clutched" his gun. Barker perceived this "clutching" as a threat that Campbell would kill him. Following that incident, Barker purchased a gun for his protection.

{¶ 12} Barker testified that when he saw Campbell parked by his mother's house on May 26, 2019, Barker intended to approach Campbell's vehicle, be assertive, and have a conversation with him. But that conversation never happened. Instead, upon seeing the Tahoe, Barker cut across the empty lot at the northwest intersection of West Second and North Antioch. As he neared Campbell's vehicle, Barker stated that he fired his gun at the passenger side of the Tahoe. Barker and the State disagreed as to how close Barker was to Campbell's vehicle when Barker began shooting and Barker's location when he fired the first shot. The evidence presented to the jury, however, showed that Campbell had not fired any shots at Barker until he exited his Tahoe. Once Campbell exited the vehicle, the two became involved in a shoot-out during which Campbell was shot once. Barker testified that, before he fired at the Tahoe, he saw Campbell look at him and pull out his gun. No eyewitness corroborated that Campbell had drawn his gun first, and Barker later told Dr. Scott Kidd that he did not think Campbell saw him before Barker began shooting.

{¶ 13} Barker testified that when he ran out of bullets, he ran backward toward North Antioch. Barker reloaded, fired an additional shot, and then left the area on foot. Barker stated that he did not realize at that time that Campbell had been shot. Campbell reentered his Tahoe, drove a short distance away, and crashed the Tahoe at a school playground. A police officer saw Campbell's vehicle and investigated the crash. Campbell was rushed to the hospital.

{¶ 14} Barker's mother told investigating police officers the identities of the men involved, and another witness, who did not know the men, stated that Barker had fired his

gun first and provided a physical description of Barker. Police officers located Barker at his downtown residence the evening of the shooting and arrested him for felonious assault. A police officer found Barker's loaded 9mm handgun and an additional magazine during a search incident to Barker's arrest.

{¶ 15} The next day, Campbell died at the hospital from a single gunshot wound to his abdomen. It was undisputed that Barker had fired the bullet that killed Campbell. During the investigation of the shooting, officers located 12 spent 9mm bullet casings that had been fired from Barker's gun. Upon processing the Tahoe, an evidence technician found two bullet holes in the SUV's windshield and several bullet strikes to the vehicle's passenger side. A spent 9mm bullet from Barker's gun was recovered from Campbell's body during his autopsy. The police also discovered several illegal drugs in Campbell's vehicle, which was consistent with someone who was a drug dealer.

{¶ 16} Several spent .40 caliber bullet casings were found on North Antioch Street near the stop sign at the southeast corner of the intersection with West Second Street. Testing showed that those casings came from Campbell's gun, which was recovered from his Tahoe.

{¶ 17} The jury found Barker guilty of all the remaining counts of the indictment. After merging several counts, the trial court sentenced Barker on one count of murder and one count of discharge of a firearm on or near prohibited premises. The court imposed a mandatory term of 15 years to life on the murder charge and an additional mandatory term of three years on the firearm specification. The court imposed a minimum term of eight years to a maximum term of twelve years on the discharge of a

firearm count and an additional three years on the firearm specification. The court ordered that the sentences be run consecutively to each other but concurrently with the having weapons under disability sentence Barker was then serving for Count 9. The aggregate prison sentence was 29 years to 33 years to life. The trial court ordered Barker to pay court costs and restitution in the amount of $4,608.78. Barker filed a timely notice of appeal and raises five assignments of error.

II.     The Jury's Rejection of Barker's Self-Defense Claim Was Not Against the Weight of the Evidence

{¶ 18} Barker's first assignment of error states:

THE MANIFEST WEIGHT OF THE EVIDENCE SUPPORTED BARKER'S SELF-DEFENSE CLAIM.

{¶ 19} Barker conceded at trial that he had killed Campbell, but he argued that he had done so in self-defense. Under his first assignment of error, Barker claims that the manifest weight of the evidence proved that he approached Campbell's vehicle and got close enough to see Campbell draw his weapon, which was the cause of the situation that gave rise to the shooting. At that point, Barker had a bona fide and honest belief that he was in imminent danger of great bodily harm or death and acted in self-defense in shooting Campbell. Further, Barker contends the law did not require him to retreat when he first saw Campbell. Finally, Barker argues that the only means of escape from the threat of imminent danger of death was the use of deadly force.

{¶ 20} The State responds that Barker created the situation that resulted in the

death of Campbell when he decided to approach Campbell's vehicle and began firing his gun at it despite not being sure if Campbell had seen him. According to the State, "The evidence clearly supported the assertion that Barker shot before [Campbell] had seen him and that Barker began shooting from the rear of the vehicle. . . . Thus, by Barker's own words, there was no situation until he approached, ambushed and started shooting at [Campbell]." Appellee's Brief, p. 12. The State also argues that Barker did not have a bona fide fear of imminent harm because Barker approached Campbell without his knowledge and Campbell was not actively threatening Barker or placing him in harm's way. *Id.* Finally, the State contends, "Barker clearly approached [Campbell] himself and could have retreated once he first saw [Campbell]. Barker was in an open public area, was not surrounded or trapped and had ample opportunity to remove himself from the situation. Instead, he approached [Campbell], with the intent to confront and shoot him, and did so, without [Campbell] having seen him." *Id.* at 13.

{¶ 21} R.C. 2901.05(B)(1) governs the burden and degree of proof required for the affirmative defense of self-defense and provides that:

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense

of another, or defense of that person's residence, as the case may be.

{¶ 22} The foregoing statute "places the initial burden of producing evidence 'that tends to support' a self-defense claim on the defendant." *State v. Bowen*, 2024-Ohio-1079, ¶ 11 (2d Dist.), quoting R.C. 2901.05(B)(1). " '[I]f the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden.' " *State v. Palmer*, 2024-Ohio-539, ¶ 20, quoting *State v. Messenger*, 2022-Ohio-4562, ¶ 25. "This burden of production is 'not a heavy one and . . . might even be satisfied through the state's own evidence.' " *Id.*, quoting *Messenger* at ¶ 22.

{¶ 23} Once the defendant puts forth sufficient evidence that he was acting in self-defense, the burden then shifts to the State to prove that the defendant did not act in self-defense. *Bowen* at ¶ 12, citing *Messenger* at ¶ 19. "To accomplish this, the State must disprove beyond a reasonable doubt at least one of the elements of self-defense." *Id.*, citing *State v. Gutierrez-Reynoso*, 2023-Ohio-3122, ¶ 72 (11th Dist.).

{¶ 24} The elements of a self-defense claim are: " '(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.' " *Messenger* at ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002).

{¶ 25} The state's burden "of disproving the defendant's self-defense claim beyond

a reasonable doubt is subject to a manifest-weight review on appeal." *Id.* at ¶ 27. "A reviewing court considering a manifest-weight claim 'review[s] the entire record, weighs the evidence and all reasonable inferences, [and] considers the credibility of witnesses.' " *State v. Group*, 2002-Ohio-7247, ¶ 77, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "The question for the reviewing court is 'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*, quoting *Martin* at 175. Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*, quoting *Martin* at 175 and citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶ 26} Barker argues his convictions were against the manifest weight of the evidence because the jury clearly lost its way in not believing his claim of self-defense. Barker asserts that his testimony demonstrated he acted in self-defense, and the State did not convincingly prove otherwise. However, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the State's version of events over the defendant's version. *State v. Lindsey*, 2015-Ohio-2169, ¶ 43 (10th Dist.). The jury remains free to believe "all, part, or none of a witness's testimony." *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.), citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 27} The State is required to disprove only one of the elements of self-defense beyond a reasonable doubt in order to sufficiently disprove a defendant's claim of self-defense. Here, though Barker asserted that Campbell was at fault in creating the situation giving rise to the affray by reaching for his gun, Barker admitted in his testimony

that he voluntarily chose, while armed, to approach Campbell, who was sitting in his Tahoe. Though Barker testified he approached Campbell's Tahoe solely to be assertive and to have a conversation with him, he approached the vehicle with a loaded gun and two extra cartridges full of bullets. Barker also explained that as he approached Campbell's vehicle, he was careful to stay far enough away so that he could see any of Campbell's movements, because Barker was concerned that Campbell might pull out his gun. Despite this concern, Barker continued to approach the Tahoe. Importantly, Barker conceded during his recorded testimony from the first trial that he had told Dr. Scott Kidd that he did not think Campbell saw him before Barker began shooting. This evidence supported the State's argument that Barker was at fault for creating the situation giving rise to the affray.

{¶ 28} Barker contends that the locations at which the bullet casings were found at the crime scene made it clear that the first shot fired by Barker was not from behind the Tahoe. According to Barker, the eyewitness saw him shoot from the sidewalk, not from behind the Tahoe on the street. Therefore, Barker argues that his testimony that he shot from the side of the Tahoe after seeing Campbell reach for a gun proved he was acting in self-defense and not responsible for creating the situation that gave rise to the affray. We disagree. As we noted above, the jury was free to believe or disbelieve any part of Barker's testimony. Regardless of whether Barker's first shot was fired from behind the Tahoe or from the side of the Tahoe, the key to Barker's self-defense claim was his statement that he had shot at Campbell solely because he first saw Campbell reach for a gun. Although the location from which Barker fired the first shot was relevant to the

State's argument that it would have been more difficult for Barker to see Campbell's movements through the tinted back window than through a side window that may have been rolled down, Barker's exact location did not eliminate Barker's damning concession that he told Dr. Kidd after the shooting that he did not believe Campbell saw him before Barker fired the first shot at Campbell.

**{¶ 29}** In light of the evidence presented at trial, we cannot conclude the jury clearly lost its way in rejecting Barker's self-defense claim.   Therefore, Barker's convictions were not against the manifest weight of the evidence.   The first assignment of error is overruled.

III.    Barker Was Not Entitled to a Jury Instruction Based on A Law that Was Enacted
        After He Fatally Shot Campbell

**{¶ 30}** Barker's second assignment of error states:

THE TRIAL COURT ERRED WHEN IT INSTRUCTED THE JURY

ON SELF-DEFENSE.

**{¶ 31}** "Following a recent amendment to R.C. 2901.09(B), 'a person has no duty to retreat before using force in self-defense . . . if that person is in a place in which the person lawfully has a right to be.' "   *Palmer*, 2024-Ohio-539, at ¶ 23, citing R.C. 2901.09(B) and 2020 Am.S.B. No. 175.   In this assignment of error, Barker contends that the trial court should have granted Barker's request for a jury instruction on self-defense in accordance with the recent amendment in 2021.   Appellant's Brief, p. 21.   Barker acknowledges in his brief "that this Court has held that Am. S.B. 175 does not retroactively

apply to conduct occurring prior to the effective date of the statute, April 6, 2021." *Id.* at 22, citing *State v. Degahson*, 2022-Ohio-2972 (2d Dist.). However, Barker points out that at the time he filed his appellate brief, the issue of the retroactive application of the new law was not yet resolved by the Ohio Supreme Court. Therefore, "Barker raises this issue on appeal to preserve the issue for possible further review if the Ohio Supreme Court overturns the holding in *Degahson*, and other cases." *Id.*

**{¶ 32}** The State responds that this Court has already ruled that Barker was not entitled to the stand your ground portion of self-defense instructions. Appellee's Brief, p. 15, citing *Barker I*, 2022-Ohio-3756 (2d Dist.). According to the State, "if and until such time that the Ohio Supreme Court rules that stand your ground should be applied retroactively, Barker's argument remains unpersuasive." *Id.* at 16.

**{¶ 33}** In *Degahson*, we held that "the trial court did not err by instructing the jury on the pre-S.B. 175 version of R.C. 2901.09, because the new version of the law became effective during the pendency of the case and the legislature did not obviously signal that it intended the amended statute to be retroactively applied." *Id.* at ¶ 23. We further stated that "the change to R.C. 2901.09 was substantive in nature and could not be applied retroactively." *Id.* In *Barker I*, we followed our holding from *Degahson*, stating, "Since the statute was amended while Barker's case was pending, R.C. 1.58 must be applied. Senate Bill 175 does not set out a penalty, punishment, or forfeiture, but instead provides substantive law creating a right to 'stand your ground.' " *Barker I* at ¶ 42, citing *Degahson* at ¶ 22. We concluded, "Because the new 'stand your ground' law was not expressly made retroactive and it constitutes a substantive amendment, the trial court did

not err in failing to give an instruction on Barker's duty to retreat in accordance with S.B. 175." *Id.* at ¶ 43.

{¶ 34} While this appeal was pending, the Ohio Supreme Court decided *State v. Miree*, 2024-Ohio-5714. There, the Court held that the relaxation of the duty to retreat enacted through the stand your ground bill did not apply to offenses committed prior to the effective date of the new law. *Id.* at ¶ 1. The Court reasoned, "Only an amendment that reduces a 'penalty, forfeiture, or punishment for any offense' applies to crimes committed before the effective date of the amendment and tried afterwards." *Id.* at ¶ 11, quoting R.C. 1.58(B). According to the Court, "We generally consider self-defense to be a 'right' or 'privilege.' . . . The standard in R.C. 2901.09 regarding the duty to retreat does not affect a 'penalty, forfeiture, or punishment for any offense,' as contemplated in R.C. 1.58(B), and instead fits within the category of an 'obligation' as contemplated in R.C. 1.58(A)(2) and (4). . . . A statute cannot change a duty after the incident has occurred." *Id.* at ¶ 12, 14.

{¶ 35} Based on the holdings in *Barker I* and *Miree*, we conclude that the trial court did not err when it refused Barker's request for a jury instruction on self-defense consistent with the stand your ground law. The second assignment of error is overruled.

IV. The Trial Court Erred by Failing to Calculate the Appropriate Amount of Jail-Time Credit

{¶ 36} Barker's third assignment of error states:

THE TRIAL COURT ERRED WHEN IT FAILED TO PROPERLY

CREDIT BARKER FOR JAIL-TIME CREDIT.

**{¶ 37}** "An offender who has been locked up in jail prior to being sentenced to prison is entitled to a credit against his prison term for any time that the offender spent in confinement awaiting trial and sentencing." *State v. Moore*, 2018-Ohio-3237, ¶ 1. "Jail-time credit is prescribed by R.C. 2967.191, which authorizes a trial court to give a defendant credit for the total number of days that he was 'confined for any reason arising out of the offense for which [he] was convicted and sentenced.' " *State v. Bowden*, 2015-Ohio-3740, ¶ 17 (1st Dist.), quoting R.C. 2967.191. "The trial court's failure to properly award jail-time credit is an error cognizable on direct appeal." *Id.* at ¶ 18, citing *State v. Hargrove*, 2013-Ohio-1860, ¶ 8 (1st Dist.).

**{¶ 38}** At the sentencing hearing, the trial court stated that Barker would receive 749 days of jail-time credit. Barker's counsel then pointed out that his client was entitled to significantly more credit than the 749 days. The trial court agreed, stating "That is correct. So it'll - - that'll have to [be] recalculated. This was as of that sentence. I don't have that. I requested that information, but that's the number that I received from our jail time credit people. But that does make more sense that he shall receive additional. So in the entry, he'll likely receive more jail time credit. However, that was as of the previous sentence. I will make that clear." Trial Tr. 625.

**{¶ 39}** In its judgment entry, the trial court stated, "The defendant is to receive credit for seven hundred forty-nine (749) days spent in confinement as of the date of sentencing stated above." Judgment Entry, p. 2. Barker contends that the trial court erred by only giving him 749 days of jail-time credit despite the fact that the court stated

at the sentencing hearing that it would credit him with additional time beyond this 749 days.   As a result, Barker argues that the trial court failed to properly calculate his jail-time credit at the time of sentencing and failed to perform its mandatory duty to notify the adult parole authority of Barker's credit for time served prior to being sentenced. Appellant's Brief, p. 24.

{¶ 40} The State agrees the trial court did not give Barker the correct amount of jail time credit at sentencing because it did not credit him for the additional jail time when "he was conveyed back to the Montgomery County jail following this Court's remand until the second termination entry was filed."   Appellee's Brief, p. 17.

{¶ 41} Barker and the State agree that the trial court did not calculate the proper amount of jail-time credit.   Because both parties agree that the jail-time credit award was incorrect and the record establishes that Barker was entitled to more than 749 days of jail-time credit, we sustain this assignment of error.   We will remand the cause to the trial court to resentence Barker after calculating the appropriate amount of jail-time credit that should be awarded to him.

{¶ 42} The third assignment of error is sustained.

V.     The Trial Court Erred By Not Considering Barker's Present and Future Ability
to Pay Before Ordering Barker to Pay Restitution

{¶ 43} Barker's fourth assignment of error states:

THE TRIAL COURT ERRED WHEN IT FAILED TO PROPERLY CONSIDER BARKER'S PRESENT AND FUTURE ABILITY TO PAY

FINANCIAL SANCTIONS.

{¶ 44} In this assignment of error, Barker points out that his defense counsel "had requested that any financial sanctions be waived due to Barker's indigence, his lack of personal assets, the fact that he had been incarcerated since June 15, 2019, and that he will be serving a potential life sentence." Appellant's Brief, p. 25. Because the trial court sentenced him to an indefinite life prison term, Barker contends that he has no present or future ability to pay restitution or court costs. *Id.*, citing *State v. Phillips*, 2009-Ohio-5305 (2d Dist.). Therefore, Barker argues that the trial court erred in ordering him to pay court costs and restitution.

{¶ 45} The State responds that court costs are required as part of the sentence and are governed by R.C. 2947.23. "Because the costs are mandatory, the trial court need not consider an ability to pay." Appellee's Brief, p. 18. Regarding restitution, the State argues that the trial court was in possession of the presentence investigation report, which revealed that Barker had an associate degree and had previously been employed. According to the State, "This shows that [Barker] did have a future ability to pay restitution, if or when he left prison." *Id.* at 19.

{¶ 46} We will first address the trial court's decision to impose court costs. In its judgment entry, the trial court stated, "Court costs to be paid in full in an amount to be determined by the Montgomery County Clerk of Courts." Judgment Entry, p. 2. "By statute, the imposition of court costs on all convicted defendants is mandatory." *State v. Taylor*, 2020-Ohio-3514, ¶ 6, citing R.C. 2947.23(A)(1)(a). "But R.C. 2947.23(C) gives a trial court continuing jurisdiction to 'waive, suspend, or modify the payment of the costs

of prosecution . . . at the time of sentencing or at any time thereafter.' So, while the court must impose costs, it may also waive, suspend, or modify them." *Id.* at ¶ 7. According to the Ohio Supreme Court, "a trial court is not required to consider the defendant's ability to pay in assessing a motion to waive, suspend, or modify court costs under R.C. 2947.23(C), though it is permitted to do so." *Id.* at ¶ 16. Based on the Court's holding in *Taylor*, we overrule this assignment of error to the extent Barker argues the trial court erred in not considering Barker's present and future ability to pay before it ordered Barker to pay court costs.

{¶ 47} Next, we address Barker's argument that the trial court erred by not considering his ability to pay when it ordered Barker to pay restitution. R.C. 2929.19(B)(5) imposes a duty upon the trial court to "consider the offender's present and future ability to pay" before imposing restitution as a financial sanction under R.C. 2929.18. "The trial court does not need to hold a hearing on the issue of financial sanctions, and there are no express factors that the court must take into consideration or make on the record." (Citation omitted.) *State v. Culver*, 2005-Ohio-1359, ¶ 57 (2d Dist.), citing *State v. Martin*, 140 Ohio App.3d 326, 338 (4th Dist. 2000). A trial court is not even required to state that it considered a defendant's present and future ability to pay. (Citations omitted.) *State v. Hull*, 2017-Ohio-7934, ¶ 9 (2d Dist.). "The record should, however, contain 'evidence that the trial court considered the offender's present and future ability to pay before imposing the sanction of restitution.' " *Culver* at ¶ 57, quoting *State v. Robinson*, 2004-Ohio-5346, ¶ 17 (3d Dist.).

{¶ 48} "Where the trial court fails to make an explicit finding on a defendant's

relative ability to pay, this court has observed that a trial court's consideration of this issue may be 'inferred from the record under appropriate circumstances.' " *State v. Conley*, 2015-Ohio-2553, ¶ 49 (2d Dist.), quoting *State v. Parker*, 2004-Ohio-1313, ¶ 42 (2d Dist.). "For example, '[t]he trial court may comply with its obligation by considering a presentence investigation report ('PSI'), which includes information about the defendant's age, health, education, and work history." *Hull* at ¶ 10, citing *State v. Willis*, 2012-Ohio-294, ¶ 4 (2d Dist.).

{¶ 49} In his sentencing memorandum, Barker asked the trial court to waive any financial sanctions, including restitution, fines, and court costs. According to his memorandum, "Defendant is indigent, has no personal assets, and has been represented by appointed counsel throughout the entirety of these proceedings. He has been incarcerated since June 15, 2019 and is serving a potential life sentence. Defendant thus has no present or future ability to pay financial sanctions in this matter." September 19, 2023 Sentencing Memorandum, p. 3. In its sentencing memorandum, the State asked the trial court to order restitution in the amount of $4,608.78, which represented the funeral expenses for the victim.

{¶ 50} At the beginning of the sentencing hearing, Barker's counsel asked the trial court to waive any costs or financial sanctions that could be waived. Trial Tr. 619. The trial court stated that it would order restitution in the amount of $4,608.78 to the victim. Trial Tr. 623. In its judgment entry, the trial court stated, in part: "The Defendant is ordered to make complete restitution to the victim . . . for economic loss in the amount of $4,608.78, to be paid through the Montgomery County Clerk of Courts." Judgment Entry,

p. 2.

**{¶ 51}** The PSI revealed that Barker was 35 years old and in good physical health. He graduated from high school in 2005. Barker was unemployed at the time of sentencing due to his incarceration but had been employed from 2017-2019, immediately prior to his incarceration. Barker described his mental health as "fair" and that he had previously been diagnosed with a bipolar disorder, a schizoaffective disorder, anxiety, delusional disorder, and post-traumatic stress disorder. Although he was not under the care of a physician, he had been prescribed Remeron and Trazadone. Barker had two ongoing child support orders, with arrearages totaling approximately $14,000.

**{¶ 52}** The PSI is in our record and arguably could have supported a finding that Barker had the future ability to pay restitution, but there is no indication in the record that the trial court reviewed the PSI prior to ordering Barker to pay restitution. On the other hand, Barker pointed to evidence in the record that he was indigent and that he had received what may end up being a life sentence. Given the particular record before us in which the trial court was silent as to whether it had considered the PSI, the trial court made no findings regarding Barker's ability to pay, and Barker pointed to evidence showing he was indigent and facing a life sentence, we will not infer that the trial court considered the PSI before ordering Barker to pay restitution. Therefore, we must conclude on this record that the trial court did not satisfy its statutory duty to consider Barker's ability to pay restitution. We will remand the matter to the trial court for the limited purpose of resentencing Barker after considering his present and future ability to pay restitution.

{¶ 53} The fourth assignment of error is sustained in part and overruled in part.


VI.     The Trial Court's Imposition of Consecutive Sentences Is Not Clearly and

        Convincingly Unsupported by the Record

{¶ 54} Barker's fifth assignment of error states:

        THE TRIAL COURT'S FINDINGS FOR THE IMPOSITION OF

CONSECUTIVE PRISON TERMS ARE CONTRARY TO LAW AND NOT

CLEARLY AND CONVINCINGLY SUPPORTED BY THE RECORD.

{¶ 55} In reviewing felony sentences, this court must apply the standard of review set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 2016-Ohio-1002, ¶ 9.  Under that statute, we may increase, reduce, or modify a sentence, or we can vacate the sentence and remand for resentencing, only if we "clearly and convincingly" find either (1) that the record does not support certain specified findings, including those under R.C. 2929.14(C)(4), or (2) that the sentence imposed is contrary to law.  *State v. Wells*, 2024-Ohio-4813, ¶ 45 (2d Dist.), citing *Marcum* at ¶ 9 and R.C. 2953.08(G)(2).  Clear and convincing evidence is that " 'which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *Marcum* at ¶ 22, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 56} Generally, when a defendant is ordered to serve a term of imprisonment, there is a presumption that the sentence shall be served concurrently with any other prison term imposed upon the offender.  R.C. 2929.41(A).  However, R.C. 2929.14(C) provides an exception to allow consecutive sentences.  Under that statute, a trial court

must make certain consecutive sentence findings at the sentencing hearing before imposing consecutive sentences "and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings." *State v. Bonnell*, 2014-Ohio-3177, syllabus. Specifically, a trial court may impose consecutive sentences if it finds that (1) consecutive service is necessary to protect the public from future crime or punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) one or more of the following findings are made:

> (a) The offender committed the offenses while awaiting trial or sentencing, was under a sanction imposed pursuant to R.C. 2929.16, R.C. 2929.17, R.C. 2929.18, or was under post-release control;

> (b) At least two of the offenses were committed as part of one or more courses of conduct, and the harm was so great that no single prison term adequately reflects the seriousness of the conduct;

> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4)(a)-(c).

{¶ 57} In his sentencing memorandum, Barker requested that the trial court order the murder and unlawful discharge of a firearm sentences to run concurrently, because "the two offenses were committed with the same conduct and the same animus." Further, Barker argued that consecutive sentences would be disproportionate to the

seriousness of his conduct because he testified that he did not want to kill Campbell and wished he were still alive. The State in its sentencing memorandum asked the court to impose the same sentences that were imposed after the first trial, including making the sentences consecutive to each other.

{¶ 58} At the sentencing hearing, the trial court stated that it had considered the purposes and principles of sentencing and the seriousness and recidivism factors of the Ohio Revised Code, including using the minimum sanctions to accomplish those purposes without unnecessarily burdening government resources. Trial Tr. 620. The court also stated, "The consecutive sentence is necessary to protect the public from future crime or to punish the offender. The consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." *Id.* at 621. The court concluded, "The offender's history of criminal conduct demonstrates the consecutive sentences are necessary to protect the public from future crime by the offender." *Id.*

{¶ 59} In its judgment entry, the trial court provided the following findings in support of its imposition of consecutive sentences: (1) the consecutive sentence is necessary to protect the public from future crime; (2) the consecutive sentence is necessary to punish the defendant; (3) consecutive sentences are not disproportionate to the seriousness of the defendant's conduct and to the danger the defendant poses to the public; and (4) the defendant's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the defendant.

{¶ 60} Barker argues that "although the trial court properly made the required

statutory findings on the record and in its sentencing entry to support the imposition of consecutive sentences, both the trial court's findings and the record fail to support a consecutive sentence." Appellant's Brief, p. 26. According to Barker, the record demonstrated that there was only one act that constituted the offenses in this case and there was "a greater amount of mitigation to Barker's actions." *Id.* Barker focuses on the evidence that Campbell had threatened Baker and had intimidated him, as well as the fact that Campbell was a drug dealer. Barker concluded, "a blanket, cold, criminal history without the facts and circumstances of each offense seems unfair to claim that one is a danger to the public and needs to be locked away as opposed to being treated and rehabilitated. Without this information, the record failed to support the trial court's findings." *Id.* at 27.

{¶ 61} The State responds that "Barker's conduct led to a shoot out on a public road between two people, which ended with a death. As his actions and crimes were serious in nature leading to the death of another, consecutive sentences were appropriate for Barker." Appellee's Brief, p. 20. The State also contends that the trial court made the proper findings to impose consecutive sentences.

{¶ 62} Barker does not present an argument in this assignment of error as to how the consecutive sentences are contrary to law. Rather, he argues that the record "clearly and convincingly" does not support the findings the trial court made pursuant to R.C. 2929.14(C)(4). Barker centers his argument around his testimony at trial that Campbell had threatened and intimidated Barker and the evidence that Campbell was a drug dealer who was armed and dangerous. The trial court had before it all the evidence presented

at trial. Barker approached Campbell while he was sitting in his vehicle and fatally shot him. He then went home and changed clothes and made dinner. Barker did not call the police to report the shooting. Campbell's fiancée testified as to how the murder had negatively affected her and left some of her children fatherless.

**{¶ 63}** The record contains a June 29, 2021 sentencing memorandum filed by the State after Barker's first trial. The State set forth Barker's criminal history as follows: one first-degree felony conviction for aggravated robbery while Barker was a juvenile; one first-degree misdemeanor conviction for aggravated menacing in 2005; one fifth-degree felony conviction for having a weapon while under a disability in 2006; one fourth-degree felony conviction for carrying a concealed weapon in 2008; one fifth-degree felony conviction in 2011 for possession of cocaine; and one fifth-degree felony conviction in 2014 for non-support of defendants. The indictment also listed two of these prior offenses. Barker's criminal history supported the trial court's imposition of consecutive sentences.

**{¶ 64}** Barker complains that it was unfair to consider his criminal history without also considering the underlying facts and circumstances involved in each of his criminal convictions. Barker fails to provide any authority for his argument that the trial court was required to conduct a detailed analysis of the underlying facts and circumstances involved in Barker's prior criminal convictions. Further, Barker made no effort at sentencing or on appeal to provide the underlying facts and circumstances from his prior convictions that he believes the trial court should have considered at sentencing.

**{¶ 65}** As Barker concedes, the trial court made the necessary findings to impose

consecutive sentences. Based on the record before us, we cannot conclude that the trial court's findings were clearly and convincingly not supported by the record. Therefore, the fifth assignment of error is overruled.

VII. Conclusion

**{¶ 66}** Having sustained Barker's third assignment of error and part of his fourth assignment of error, we will reverse the judgment in part and remand the cause for the limited purpose of resentencing Barker after 1) calculating the appropriate amount of jail-time credit that should be awarded to him and 2) considering Barker's present and future ability to pay restitution. We will affirm the judgment of the trial court in all other respects.

. . . . . . . . . . . . .

EPLEY, P.J. and WELBAUM, J., concur.